IN THE SUPREME COURT OF NORTH CAROLINA

No. 300A18

Filed 10 May 2019

WELLS FARGO INSURANCE SERVICES USA, INC.

v.

KEVIN LINK, NELSON RAYNOR, ELIZABETH PACK, and BB&T INSURANCE SERVICES, INC.


Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion on defendants' motion to dismiss entered on 8 May 2018 by Judge Gregory P. McGuire, Special Superior Court Judge for Complex Business Cases, in Superior Court, Wake County, after the case was designated a mandatory complex business case by the Chief Justice under N.C.G.S. § 7A-45.4(a). Heard in the Supreme Court on 10 April 2019.

*Fisher & Phillips LLP, by J. Michael Honeycutt, Meredith W. Norvell, and Holly N. Mancl, for plaintiff-appellant.*

*Parry Tyndall White, by K. Alan Parry, Michelle M. Walker, and Megan E.A. Bishop, for defendant-appellees.*


PER CURIAM.


AFFIRMED.

STATE OF NORTH CAROLINA
COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 12848

WELLS FARGO INSURANCE
SERVICES USA, INC.,

Plaintiff,

v.

KEVIN LINK, NELSON RAYNOR,
ELIZABETH PACK and BB&T
INSURANCE SERVICES, INC.

Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO
DISMISS**

THIS MATTER comes before the Court on Defendants Kevin Link, Nelson Raynor, Elizabeth Pack, and BB&T Insurance Services, Inc.'s Partial Motion to Dismiss Pursuant to Rule 12(b)(6). ("Motion to Dismiss", ECF No. 7.) Defendants seek to dismiss Counts One–Five, Seven, and Eight in the Complaint, but do not seek dismissal of Count Six.

THE COURT, having considered the Motion to Dismiss, the briefs filed in support of and in opposition to the Motion to Dismiss, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES, in its discretion, that the Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

*Fisher & Phillips, by J. Michael Honeycutt and Meredith W. Norvell, for Plaintiff Wells Fargo Insurance Services USA, Inc.*

*Parry Tyndall White, by K. Alan Parry and Michelle M. Walker, for Defendants Kevin Link, Nelson Raynor, Elizabeth Pack, and BB&T Insurance Services, Inc.*

McGuire, Judge.

## I.  FACTS AND PROCEDURAL BACKGROUND

1.  The Court does not make findings of fact on motions to dismiss under N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) (hereinafter, "Rule(s)"), but only recites those facts included in the complaint that are relevant to the Court's determination of the Motion.  *See, e.g., Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

### A.  *The parties*

2.  Plaintiff Wells Fargo Insurance Services USA, Inc. ("Plaintiff" or "Wells Fargo") is a North Carolina-licensed insurance broker that sells insurance products and services to its customers.  (Compl., ECF No. 3, at ¶ 9.)  Wells Fargo alleges that it provides "insurance products and services that are unique to the particular needs of its customers."  (*Id.* at ¶ 16.)

3.  Defendant BB&T Insurance Services, Inc. ("BB&T") is also an insurance broker providing insurance products and services to its customers in the same segment of the insurance market.  (*Id.* at ¶ 10.)

4.  Wells Fargo employed Defendant Kevin Link ("Link") as a Senior Sales Executive.  Link was responsible for "soliciting insurance customers and providing risk management services."  (*Id.* at ¶ 11.)  Link resigned from Wells Fargo effective October 31, 2016, and began working for BB&T.  (*Id.*)

5.  Wells Fargo employed Defendant Nelson Raynor ("Raynor") as a Commercial Insurance Producer.  Raynor was responsible for "procuring insurance

customers and providing risk management services." (*Id*. at ¶ 12.) On April 12, 2017, Raynor resigned from Wells Fargo and began working for BB&T. (*Id*.)

6.    Wells Fargo employed Elizabeth Pack ("Pack") as a Marketing Placement Specialist. Pack was responsible for marketing to Wells Fargo's insurance customers. (*Id*. at ¶ 13.) On April 3, 2017, Pack resigned from Wells Fargo and began working for BB&T. (*Id*. at ¶ 13.) (Collectively, Link, Raynor, and Pack are referred to as the "Individual Defendants.")

7.    While employed with Wells Fargo, the Individual Defendants "brokered and serviced the insurance needs of Wells Fargo customers assigned to them" and had knowledge about the insurance needs and policies of their customers. (*Id*. at ¶ 14.)

8.    Wells Fargo has developed and maintains certain "confidential and trade secret information" concerning its customers. (*Id*. at ¶¶ 17–21.)    The confidential and trade secret information "provides Wells Fargo with a competitive advantage over its competitors who do not know the information." (*Id*. at ¶ 20.) Wells Fargo makes efforts to protect the secrecy of its confidential and trade secret information through the use of written confidentiality agreements, and the implementation of a Code of Ethics and Information Security Policy and policies in its Team Member Handbook. (*Id*. at ¶¶ 22–25.)

### B. Link's and Raynor's Restrictive Agreements

9.    During their employment with Wells Fargo, Link and Raynor each executed an agreement with Wells Fargo entitled "Agreement Regarding Trade

Secrets, Confidential Information, Nonsolicitation and Assignment of Inventions"

(the "Restrictive Agreements"). (ECF No. 3, at ¶ 27; Link Restrictive Agreement,

ECF No. 3, Ex. 1; Raynor Restrictive Agreement, ECF No. 3, Ex. 2.) The Restrictive

Agreements provide that for a period of two (2) years immediately following

termination of their employment for any reason, Link and Raynor will not:

a. [S]olicit, recruit or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services;

b. [S]olicit, participate in or promote the solicitation of any of the Company's clients, customers, or prospective customers with whom [they] had Material Contact and/or regarding whom [they] received Confidential Information, for the purpose of providing products or services that are in competition with the Company's products or services ("Competitive Products/Services"). "Material Contact" means interaction between [them] and the customer, client or prospective customer within one (1) year prior to [their] last day as a team member which takes place to manage, service, or further the business relationship; or

c. Accept insurance business from or provide Competitive Products/Services to customers or clients of the Company:
   i. with whom [they] had Material Contact, and/or
   ii. were [their] clients or customers of the Company within six (6) months prior to [their] termination of employment.

(ECF No. 3, at ¶¶ 30, 34.)

10. The Restrictive Agreements also prohibit Link and Raynor from using

or disclosing Wells Fargo's "Trade Secrets" and "Confidential Information". (*Id.* at

¶¶ 30 and 35.) The Restrictive Agreements define "Trade Secrets" as including, but

not limited to:

[T]he names, addresses, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to

any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;

[A]ny information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes;

[A]ny other proprietary and confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

(ECF No. 3, at Exs. 1 and 2.) The Restrictive Agreements do not contain a separate definition of "Confidential Information."

11. The Restrictive Agreements define "the Company" as: "a Wells Fargo company and/or any of its past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions." (*Id.*)

12. Under the Restrictive Agreements, Link and Raynor also were required to return to Wells Fargo upon termination of employment all "Confidential Information of the Company" and all "Records of the Company" in their respective possessions. (*Id.* at ¶¶ 31, 36; Exs. 1 and 2.)

### C. The resignations from Wells Fargo and breaches of the Restrictive Agreements

13. Link resigned from Wells Fargo on October 31, 2016, Pack resigned on April 3, 2017, and Raynor resigned on April 12, 2017. Link and Raynor "solicit[ed]

and encourage[ed]" each other, and Pack, to terminate employment with Wells Fargo. (ECF No. 3, at ¶¶ 40–41.)

14. On or about April 12, 2017, immediately prior to submitting his resignation, Raynor entered Wells Fargo's offices at around 8:00 p.m. and printed and copied documents for approximately one hour. (*Id.* at ¶¶ 42, 101.) Wells Fargo alleges that it "is informed and believes . . . that the documents printed and copied by Defendant Raynor contained highly confidential and trade secret information belonging to Wells Fargo." (*Id.* at ¶ 46.)

15. Since becoming employed with BB&T, Link, Raynor, and Pack have contacted and solicited Wells Fargo's customers "in an attempt to divert their insurance business away from Wells Fargo" and to BB&T. (*Id.* at ¶¶ 47–48.) Wells Fargo alleges upon information and belief that Link, Raynor, and Pack used Wells Fargo's trade secrets and confidential information "to identify, contact, solicit and induce Wells Fargo clients to transfer their accounts and otherwise divert business from Wells Fargo to BB&T." (*Id.* at ¶ 56.) In the Complaint, Wells Fargo lists approximately 18 Wells Fargo customers assigned to Link or Raynor who have transferred their insurance business to BB&T since Link and Raynor left Wells Fargo. (*Id.* at ¶¶ 53–71.)

16. On November 27, 2017, Wells Fargo filed the Complaint. In the Complaint, Wells Fargo alleges four separate claims against Link and Raynor for breaches of Restrictive Agreements: breach of the non-solicitation of customers provision (Count One); breach of the non-solicitation of employees provisions (Count

Two); breach of the confidential information provisions (Count Three); and breach of the return of property provision (Count Four). Wells Fargo also alleges the following claims against all of the Defendants: misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act ("NCTSPA"), N.C. General Statute § 66-152 et seq., (hereinafter "G.S.") (Count Five); tortious interference with contractual relations (Count Seven); and unfair and deceptive trade practices (Count Eight). Finally, Wells Fargo alleges a claim for computer trespass under G.S. § 14-458 against Raynor only (Count Six).

17. On November 28, 2017, the case was designated to the North Carolina Business Court and assigned to the undersigned. (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.)

18. On December 28, 2017, Defendants filed the Motion to Dismiss and a supporting memorandum of law. (Def. Memo. Supp. Mot. Dismiss, ECF No. 8.) On January 22, 2018, Plaintiff filed its brief in opposition to the Motion to Dismiss. (Pl. Br. Opp. Mot. Dismiss, ECF No. 10.) Defendants filed a reply on February 8, 2018. (Def. Reply Supp. Mot. Dismiss, ECF No. 15.) On February 20, 2018, the Court heard oral argument on the Motion to Dismiss. The Motion to Dismiss is now ripe for disposition.

## II.    ANALYSIS

19. The Court, in deciding a Rule 12(b)(6) motion, treats the well-pleaded allegations of the complaint as true and admitted. *Sutton v. Duke*, 277 N.C. 94, 98 (1970). However, conclusions of law or unwarranted deductions of fact are not

deemed admitted. *Id.* The facts and permissible inferences set forth in the complaint are to be treated in a light most favorable to the nonmoving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156 (1986). As our Court of Appeals has noted, the "essential question" raised by a Rule 12(b)(6) motion is "whether the complaint, when liberally construed, states a claim upon which relief can be granted on any theory." *Barnaby v. Boardman*, 70 N.C. App. 299, 302, 318 S.E.2d 907, 909 (1984), *rev'd on other grounds*, 313 N.C. 565 (1985) (citations and emphasis omitted).

20.    Our appellate courts frequently reaffirm that North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 646–47, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the res judicata, and to show the type of case brought." *Id.* Accordingly, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton*, 277 N.C. at 103, 176 S.E.2d at 166 (1970) (emphasis omitted).

21.    A Rule 12(b)(6) motion should be granted when the complaint, on its face, reveals (a) that no law supports the plaintiff's claim, (b) the absence of facts sufficient to form a viable claim, or (c) some fact which necessarily defeats the plaintiff's claim. *Jackson v. Bumgardner*, 318 N.C. 172, 175 (1986). In addition, the Court may consider documents which are the subject of plaintiff's complaint and to

which the complaint specifically refers, including the contract that forms the subject matter of the action. *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

22. The Court first will address Wells Fargo's claims for breach of the Restrictive Agreements by Link and Raynor, and then the claims alleged against all of the Defendants.

### A. Breach of the non-solicitation of customers restriction (Count One)

23. In its first claim, Wells Fargo alleges Link and Raynor breached the prohibitions against soliciting or accepting insurance business from Wells Fargo's customers contained in sections III.b. and III.c. of the Restrictive Agreements. (ECF No. 3, at ¶¶ 80–84.) Section III.b. prohibits Link and Raynor from soliciting "the Company's" customers or prospective customers with whom they had "Material Contact and/or" customers about whom they received "Confidential Information." (*Id.* at ¶¶ 30 and 34.) "Material Contact" is defined as interaction with the customer during the year prior to their respective terminations of employment from Wells Fargo. Section III.c. of the Restrictive Agreements prohibits Link and Raynor from accepting "insurance business" from or providing competitive products and services to customers of "the Company" with whom they had "Material Contact and/or" who were "customers of the Company within six (6) months prior to [their] termination of employment." (*Id.*)

24. North Carolina courts will enforce a covenant not to compete if it is: "(1) in writing; (2) reasonable as to [the] terms, time, and territory; (3) made a part of

the employment contract; (4) based on valuable consideration; and (5) not against public policy." *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990); *United Lab., Inc. v. Kuykendall*, 322 N.C. 643, 649–50, 370 S.E.2d 375, 380 (1988). The party seeking enforcement of a restrictive covenant has the burden of proving its reasonableness. *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). The reasonableness of a non-competition covenant is a matter of law for the court to decide. *Id.*

25. In the absence of an express geographic territory restriction, a court can enforce a restriction prohibiting a former employee from soliciting customers or clients. *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 526, 379 S.E.2d 824, 826f (1989) (relying on *Kuykendall* and enforcing a noncompetition agreement that included client-based restrictions for 24 months without any expressly defined geographical territory other than the employee's sales territory at the time of termination and holding that "customers developed by a salesperson are the property of the employer and may be protected by a contract under which the salesperson is forbidden from soliciting those customers for a reasonable time after leaving his or her employment"); *Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 147 N.C. App. 463, 469, 556 S.E.2d 331, 336 (2001) (enforcing covenant prohibiting solicitation of any former employer's customers).

26. A customer-based restriction on solicitation is analyzed in much the same manner as a geographic restriction, taking into consideration many of the same factors and, particularly, the time period of the restriction. *See, e.g., Wade S. Dunbar*

*Ins. Agency,* 147 N.C. App. at 469, 556 S.E.2d 335; *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 281–82, 530 S.E.2d 878, 883 (2000) ("The geographic limitation of that case is analogous to the client-based limitation in the case at bar."); *Sandhills Home Care, L.L.C. v. Companion Home Care – Unimed, Inc.*, 2016 NCBC LEXIS 61, at *25 (N.C. Super. Ct. Aug. 1, 2016).

27.    In this case, Defendants challenge the prohibitions on soliciting or accepting insurance business from Wells Fargo customers on the grounds that the definitions of the terms "the Company" and "Confidential Information" make the restrictions unreasonably broad and vague, and unenforceable as a matter of law. (ECF No. 8, at pp. 8–10.)  Accordingly, the Court must determine whether sections III.b. and III.c. are unreasonable as a matter of law.

### i.    Section III.b.

28.    Section III.b. does not have a geographic restriction, but instead prohibits Link and Raynor, for a period of two years, from soliciting "the Company's" customers and prospective customers with whom Link and Raynor had "Material Contact and/or" about whom they received "Confidential Information." (ECF No. 3, at Exs. 1 and 2, sec. III.)  Defendants do not challenge the reasonableness of the prohibition on Link and Raynor soliciting Wells Fargo customers or prospective customers with whom they had Material Contact.  Instead, Defendants argue that the terms "the Company" and "Confidential Information" are defined so broadly in the Employment Agreement that it makes the prohibition against Link and Raynor soliciting customers and prospective customers about whom they received

"Confidential Information" unreasonably vague and overly broad. (ECF No. 8, at pp. 8–10.)

29. The Employment Agreements define "the Company" to include not only Wells Fargo Insurance Services, but also its "past, present, and future parent companies, subsidiaries, predecessors, successors, affiliates, and acquisitions." (ECF No. 3, Exs. 1 and 2.) The Employment Agreement does not identify the subsidiary and affiliate companies, but according to publicly available data from Wells Fargo, it is a vast organization with many affiliate companies.

30. Wells Fargo noted to its shareholders in its 2016 Annual Report that Wells Fargo "provide[s] banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,600 locations, 13,000 ATMs, digital (online, mobile and social), and contact centers (phone, email and correspondence), and [Wells Fargo] ha[s] offices in 42 countries and territories." WELLS FARGO, 2016 ANNUAL REPORT 36 (2016)[1]. Wells Fargo listed 44 significant subsidiaries in an attached exhibit to its Form 10-K annual report to the United States Securities Exchange Commission ("SEC") for 2017. Wells Fargo, Form 10-K Annual Report to SEC (Exhibit 21) (Jan. 3, 2018)[2]. The listed subsidiaries include, *inter alia,* companies that provide personal, commercial, and real estate financing, insurance companies, venture capital firms, securities companies, and holding companies. *Id.*

---

[1] Available online at: https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2016-annual-report.pdf

[2] Available online at:
https://www.sec.gov/Archives/edgar/data/72971/000007297118000272/wfc-12312017xex21.htm

In 2016, Wells Fargo employed over 269,000 full-time employees. WELLS FARGO, 2016 ANNUAL REPORT 36 (2016).

31. Defendants contend that North Carolina courts have found similarly broad prohibitions on soliciting customers of parent, subsidiary, and affiliate companies for whom the former employees performed no services unreasonable as matter of law. *Medical Staffing Network*, 194 N.C. App. at 657, 670 S.E.2d at 328 (finding restrictive covenants unenforceable because the plaintiff had no legitimate business interest in foreclosing solicitation of clients of "an unrestricted and undefined set of [the plaintiff's] affiliated companies that engage in business distinct from the . . . business in which [the defendant] had been employed").

32. To the extent that Link and Raynor are prohibited from soliciting Wells Fargo customers or prospective customers with whom they had "Material Contact" during the last year of their employment, the potential inclusion of customers of affiliate companies does not necessarily render the restriction overbroad and unreasonable. *See, e.g., Laboratory Corp. of America Holdings v. Kearns*, 84 F. Supp. 3d 447, 459 (M.D.N.C. Jan. 30, 2015) ("In North Carolina, covenants prohibiting competition for a former employer's customers are only enforceable when they prohibit the employee from contacting customers with whom the employee actually had contact during his former employment."). If Link and Raynor had significant interactions with customers or prospective customers of affiliate companies of Wells Fargo, Wells Fargo may have a legitimate interest in restricting them from soliciting those customers.

33.     Link and Raynor, however, are not only prohibited from soliciting Wells Fargo customers with whom they had "Material Contact", but also from soliciting customers and prospective customers about whom they received "Confidential Information."   The Restrictive Agreements define "Confidential Information" as including "the Company's Trade Secrets and other proprietary information relating to its business methods, personnel, and customers."  (ECF No. 3, at Exs. 1 and 2, sec. II.)  Wells Fargo's "Trade Secrets" are defined as including, but not limited to:

> [T]he names, address, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives;
>
> [A]ny information concerning the Company's operations, including without limitation, information related to its methods, services, pricing, costs, margins and mark ups, finances, practices, strategies, business plans, agreements, decision-making, systems, technology, policies, procedures, marketing, sales, techniques, agent information, and processes; [and]
>
> [A]ny other proprietary and/or confidential information relating to the Company's customers, employees, products, services, sales, technologies, or business affairs.

(*Id.*)

34.     The Restrictive Agreements further expand the definition of "Confidential Information" to include the "Records of the Company,"  and provide that:

'Records' include, but are not limited to original, duplicated, computerized, memorized, handwritten or any other form of information, whether contained in materials provided to me by the Company, or by any institution acquired by the Company, or compiled by me in any form or manner including information in documents or electronic devices, such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories maintained in personal computers, laptop computers, personal digital assistants or any other device.

(*Id.*)

35.     Defendants argue that the restriction on soliciting customers or prospective customers of "the Company" about whom they received "Confidential Information" is far too broad based on the definitions used in the Restrictive Agreements.    For example, the Restrictive Agreements define "Confidential Information" as including the names and addresses of customers and prospective customers of Wells Fargo and any of its affiliate companies, and Wells Fargo's "Records" as including "memorized, handwritten or any other form of information, . . . such as software, flowcharts, graphs, spreadsheets, resource manuals, videotapes, calendars, day timers, planners, rolodexes, or telephone directories."    Arguably, the clause prohibits solicitation of any customers or prospective customers of Wells Fargo-affiliate companies whose name, address, or other contact information was shown (purposefully or inadvertently) to Link or Raynor during their employment, whether or not that customer or prospective customer had any dealings with Wells Fargo's insurance division or with Link or Raynor.  Defendants aptly point out that, read literally, the non-solicitation provision

in section III.b. would prohibit Link and Raynor from soliciting a prospective customer of a Wells Fargo affiliate company based simply on them having seen an "actual or prospective customer's name in a calendar, day timer, planner, rolodex, or telephone directory maintained anywhere at any Wells Fargo company." (ECF No. 8, at pp. 9–10.)

36.     In its brief, Plaintiff does not address the breadth of the definitions of "the Company" and "Confidential Information" in the Restrictive Agreements, or attempt to explain why it has a business interest in prohibiting solicitation of such a vast array of customers. Instead, it argues that the provision restricting solicitation of customers or prospective customers about whom Link and Raynor received "Confidential Information" can be disregarded because "Link and Raynor would not have had access to confidential information concerning a client or customer they did not service, and there is no allegation in the Complaint alleging that they did." (ECF No. 10, at p. 9.) Plaintiff misapprehends their burden in responding to the Motion to Dismiss. Plaintiff has not alleged that Link and Raynor received "Confidential Information" only regarding Wells Fargo customers and prospective customers whom they serviced, and the Court cannot accept the representations in its brief in lieu of allegations in the Complaint.

37.     At the hearing on the Motion to Dismiss, Plaintiff's counsel also suggested that Wells Fargo would only seek to restrain Link and Raynor from soliciting customers with whom they had "Material Contact," as Plaintiff has done in this lawsuit, and not customers about whom Link and Raynor received Confidential

Information. This argument, however, is unavailing. It is the Court's duty at this stage to analyze the restrictive covenant, as alleged, and determine whether it is reasonable and enforceable. The Court cannot read provisions out of the Restrictive Agreements based on Plaintiff's representations in order to make the covenant enforceable. A court may not construe an agreement in a way that ignores or deletes its plain terms. *See, e.g., State v. Philip Morris USA, Inc.*, 193 N.C. App. 1, 12–13, 666 S.E.2d 783, 791 (2008) (stating that where the language of a contract is unambiguous, a court cannot ignore, insert, or improperly construe the meaning of any contract terms, but instead a court must infer the intent of the parties from the terms in the contract); *Happ v. Creek Pointe Homeowner's Ass'n*, 215 N.C. App. 96, 103–04, 717 S.E.2d 401, 406 (2011) (holding that even where the language of a contract is ambiguous, it is a "fundamental rule of contract construction" that the court "gives effect to all of its provisions, if the court is reasonably able to do so").

38. Finally, Plaintiff argues that, to the extent the prohibition in section III.b. on soliciting customers about whom Link and Raynor received "Confidential Information" makes the covenant over-broad, the Court can "blue pencil," or remove, that provision and enforce only the restriction on soliciting customers with whom they had "Material Contact." (ECF No. 10, at pp. 12–13.) Under the "blue pencil doctrine," North Carolina courts may specifically enforce divisible or separable sections of restrictive covenants while striking portions that are unenforceable. *Whittaker General Medical Corp.*, 324 N.C. at 528, 379 S.E.2d at 828 ("If the contract is separable, however, and one part is reasonable, the courts will enforce the reasonable

provision" (citing *Welcome Wagon, Inc. v. Pender*, 255 N.C. 244, 120 S.E. 2d 739 (1961).); *see also*, *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920 (1994) ("When the language of a covenant not to compete is overly broad, North Carolina's "blue pencil" rule severely limits what the court may do to alter the covenant. A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant.").

39.     The Court cannot "blue pencil" the provisions in section III.b. because the provision addressing customers about whom Link and Raynor received "Confidential Information" is not "distinctly separable" from the "Material Contact" provision. The two provisions are not contained in separately numbered paragraphs, separate sentences, or even separated by the word "or." Rather, the provisions are separated by the term "and/or." The use of "and/or" suggests that the prohibitions could be read in both the conjunctive and disjunctive senses, and creates an ambiguity. "When the language in a contract is ambiguous, we view the practical result of the restriction by 'construing the restriction strictly against its draftsman[.]'" *Electrical South, Inc. v. Lewis*, 96 N.C. App. 160, 167, 385 S.E.2d 352, 356 (1989) (citing *Manpower of Guilford County, Inc. v. Hedgecock*, 42 N.C. App. 515, 522, 257 S.E.2d 109, 115 (1979)). In this case, the Court concludes that the term "and/or" must be construed against Wells Fargo and read in the conjunctive sense for the purpose of applying the "blue pencil" doctrine. Under this interpretation, the provision restricting Link and Raynor from soliciting customers about whom they

received "Confidential Information" is not clearly separable from the other restrictions in section III.b. and cannot be stricken.

### ii. Section III.c.

40. Section III.c. of the Restrictive Agreement prohibits Link and Raynor, for two years from their dates of termination, from accepting "insurance business from or provid[ing] Competitive Products/Services to" customers of "the Company" with whom they had "Material Contact, and/or" who were customers of "the Company" within the six months prior to their respective terminations from Wells Fargo. (ECF No. 3, at ¶¶ 30 and 34; Exs. 1 and 2.)

41. Defendants first challenge the scope of section III.c. on the grounds that it prohibits Link and Raynor from "accepting insurance business from" former Wells Fargo customers. (ECF No. 8, at pp. 10–11.) Defendants contend that the term "insurance business" is undefined in the Restrictive Agreements and could encompass insurance products and services beyond the commercial insurance policies and services with which Link and Raynor were involved. (*Id.*) Defendants argue that the prohibition on accepting "insurance business" of any type from former customers is broader than necessary to protects Wells Fargo's business interests. (*Id.*) While the Court concludes that there may be merit to Defendants' argument, the Court arguably could "blue pencil" the phrase "accepting insurance business from" out of the description of the conduct restricted by section III.c. because the term is separated from the prohibition on "provid[ing] Competitive Products/Services to" by the word "or", and could be viewed as a "distinctly severable" part of the covenant. *Hartman,*

117 N.C. App. at 317, 450 S.E.2d at 920; *see also, Superior Performers, Inc. v. Meaike*, 2014 U.S. Dist. LEXIS 50302, at \*39–40 (M.D.N.C. Apr. 11, 2014) ("Although it is not separated off by number or in a different clause, the language can readily be struck through and the rest of the restrictive covenant still makes sense and stands on its own. Therefore, to the extent that the "or its Affiliates" language renders the restrictive covenant unreasonable, it is likely separable from the remainder of the covenant, which is reasonable.").

42.     However, even if the phrase "accepting insurance business from" could be severed from the prohibition, it would not salvage the covenant in section III.c. because the covenant prohibits Link and Raynor from providing competitive insurance products to customers with whom they had "Material Contact, and/or . . . customers of the Company within six (6) months prior to" their respective terminations from employment with Wells Fargo. (ECF No. 3, at ¶¶ 30 and 34.) Again, "the Company" is defined so broadly in the Restrictive Agreements that it sweeps within its ambit customers of far-flung Wells Fargo subsidiaries and affiliates unrelated to Wells Fargo's commercial insurance business, and customers w ith whom Link and Raynor would have had no contact. *See, Medical Staffing Network*, 194 N.C. App. at 657, 670 S.E.2d at 328. In addition, for the same reasons discussed above, the use of "and/or" must be construed against Wells Fargo, and III.c.ii. cannot be "blue penciled" out of the covenant contained in section III.c. Accordingly, the Court concludes that the restrictive covenant in section III.c. is too broad and is unreasonable as a matter of law.

43. Sections III.b. and III.c. of the Restrictive Agreements are too broadly written to be enforceable under North Carolina law. Accordingly, Defendants' motion to dismiss Plaintiff's First Count for breach of the non-solicitation of customers provisions in sections III.b. and III.c. of the Restrictive Agreements should be GRANTED.

### B. Breach of the non-solicitation of employees covenants (Count Two)

44. In its second claim, Wells Fargo alleges that Link and Raynor breached the provisions of the Restrictive Agreements prohibiting them from soliciting Wells Fargo's employees to terminate employment with Wells Fargo. (ECF No. 3, at ¶¶ 80–84.) Section III.a. of the Restrictive Agreements provide that for two years following termination, Link and Raynor "will not . . . solicit, recruit, or promote the solicitation or recruitment of any employee or consultant of the Company for the purpose of encouraging that employee or consultant to leave the Company's employ or sever an agreement for services." (*Id*. at ¶¶ 30 and 34.)

45. Courts in North Carolina have recognized that reasonable restrictions on a former employee's right to solicit an employer's current employees are enforceable. *Kennedy v. Kennedy*, 160 N.C. App. 1, 11–12, 584 S.E.2d 328, 335 (2003) ("[T]he covenant prohibiting Carroll from soliciting and hiring plaintiff's former employees for the three-year period does not violate public policy."); *Superior Performers, Inc.*, 2014 U.S. Dist. LEXIS 50302, at *30 (finding a two year restriction on soliciting former employer's current employees reasonable). A restriction on

solicitation of employees generally is subject to the same requirements as other restrictive covenants. *Sandhills Home Care, L.L.C.*, 2016 NCBC LEXIS 61, at \*36.

46. Here, the non-solicitation of employees covenant is in writing and supported by consideration. Defendants do not argue that the covenant would violate public policy. *See, Sandhills Home Care,* 2016 NCBC LEXIS 61, at \*36 (citing *Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 510, 740 S.E.2d 923, 927 (2013)). Defendants contend, however, that the non-solicitation of employees restriction is overbroad and unreasonable because it prohibits Link and Raynor from soliciting employees of "the Company." (ECF No. 8, at pp. 11–12.) As noted herein, in 2016, Wells Fargo claimed to have 44 subsidiary companies employing a total of over 269,000 employees in personal and commercial banking, investment, insurance, and other businesses. As written, the Restrictive Agreement would prohibit Link and Raynor from soliciting or attempting to solicit hundreds of thousands of employees in a variety of businesses other than commercial insurance and across a vast geographic area.

47. Covenants restricting former employees from soliciting a former employer's employees are another means of protecting the former employer's interest in the good-will it has with its customers. *Kennedy*, 160 N.C. App. at 11–12, 584 S.E.2d at 335 (enforcing prohibition against dentist soliciting his former practice's employees, holding "[t]he evidence demonstrates that plaintiff's employees, many of whom had been employed in plaintiff's practice for several years, were a valuable part of the asset owned by plaintiff, that the employees had developed personal

relationships with plaintiff's patients, that the employees were an integral part of a patient's experience with plaintiff").  To establish that a non-solicitation of employees covenant is reasonable, an employer must establish that it has a protectable business interest in prohibiting solicitation of former employees, and such prohibition must be no broader than necessary to protect that interest.  In *Medical Staffing Network, Inc.,* the Court held that a prohibition on the defendant soliciting employees of the plaintiff's affiliate businesses for which the defendant did not work was overbroad.

> [The plaintiff] presented no evidence, and the trial court made no findings that [the plaintiff] had any legitimate business interest in . . . foreclosing the solicitation of employees of . . . an unrestricted and undefined set of [the plaintiff's] affiliated companies that engage in business distinct from the medical staffing business in which [the defendant] had been employed. We conclude that on its face, this bar extends beyond any legitimate interest [the plaintiff] might have in this case.

194 N.C. App. at 657, 670 S.E.2d at 328.

48.    Plaintiff has not alleged any facts that would support a legitimate business interest in restricting Link or Raynor from soliciting employees working for Wells Fargo's affiliate companies in any segment of the banking, investment, or insurance industries.  It is highly unlikely that the vast majority of these employees would have had any involvement or contact with Wells Fargo's commercial insurance customers. The non-solicitation of employees covenant, as written, is unreasonable and unenforceable as a matter of law.  *Id.*

49.	Accordingly, the Defendants' motion to dismiss Count Two for breach of the non-solicitation of employees provisions in section III.a. of the Restrictive Agreements should be GRANTED.

### C. Breach of the confidentiality covenant against Link and return of property provision against Link (Counts Three and Four)

50.	Plaintiff also makes claims that Link and Raynor violated the covenants prohibiting use or disclosure of "Confidential Information," and the provisions requiring return of "Records" and "Confidential Information," in the Restrictive Agreements. (ECF No. 3, at ¶¶ 85–94.) Defendants argue the Complaint does not state claims against Link and seek dismissal of Counts Three and Four against Link only. (ECF No. 8, at pp. 12–14.) They do not seek dismissal of these claims against Raynor. (*Id.*) Defendants argue that Plaintiff makes nothing more than conclusory allegations against Link, and does not plead facts supporting the claims for breach of the confidentiality and return of property provisions. (*Id.*)

51.	"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of [the] contract." *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005); *Regency Ctrs. Acquisition, LLC v. Crescent Acquisitions, LLC*, 2018 NCBC LEXIS 7, at *18 (N.C. Super. Ct. Jan. 24, 2018). The North Carolina Court of Appeals has held that "an agreement is not in restraint of trade . . . if it does not seek to prevent a party from engaging in a similar business in competition with the promisee, but instead seeks to prevent the disclosure or use of confidential information." *Chemimetals Processing, Inc. v. McEneny*, 124 N.C. App. 194, 197, 476 S.E.2d 374, 376 (1996). Such an agreement is enforceable "even though

the agreement is unlimited as to time and area, upon a showing that it protects a legitimate business interest of the promisee." *Id.* at 197, 476 S.E.2d at 376-77 (citation omitted).

52.     The Court has thoroughly reviewed the allegations in the Complaint and concludes that Plaintiff has sufficiently alleged a claim against Link for breach of the "Confidential Information" restrictions, but has not alleged any facts that would support the claim that Link failed to return "Records and Confidential Information" after his resignation from Wells Fargo.

53.     With regard to the claim for breach of the "Confidential Information" covenant, Plaintiff alleges that Link executed the Restrictive Agreement prohibiting the use or disclosure of "Confidential Information." (ECF No. 3, at ¶ 30.)  Plaintiff further alleges that Link solicited and obtained for BB&T the insurance business of customers that he serviced for Wells Fargo.  (*Id.* at ¶¶ 39, 47, and 53.)  Finally, Plaintiff alleges, albeit "upon information and belief", that Link "used "Wells Fargo's Confidential Information . . . to identify, contact, solicit, and induce" his former customers and to divert their business to BB&T.  (*Id.* at ¶¶ 56, 88.)  These allegations sufficiently state a claim for breach of contract regarding the "Confidential Information" provisions of the Restrictive Agreement at this stage of the case. *Myrtle Apartments, Inc. v. Lumbermen's Mut. Casualty Co.*, 258 N.C. 49, 51, 127 S.E.2d 759, 761 (1962) (finding that in stating claims in a complaint, a plaintiff "may allege facts based on actual knowledge, or upon information and belief").  Defendants' motion to dismiss Plaintiff's Count Three against Link should be DENIED.

54.     With regard to Count Four, the Complaint contains only the conclusory allegation that Link "fail[ed] to return to Wells Fargo its property upon resigning" from employment with Plaintiff. (*Id.* at ¶ 92.) Plaintiff does not, however, allege what property Link possessed or failed to return at the time of his resignation, nor any other facts underlying its claim for breach of the return of property provisions in the Restrictive Agreement. This is insufficient to support a claim for breach of the return of property provision. *Myrtle Apartments, Inc.*, 258 N.C. at 51, 127 S.E.2d at 761 ("In testing the sufficiency of a complaint, the court ignores the conclusions and looks to the facts.") Defendants' motion to dismiss Count Four against Link should be GRANTED.

### D. Misappropriation of trade secrets (Count Five)

55.     Plaintiff makes claims for misappropriation of trade secrets against all of the Defendants. (ECF No. 3, at ¶¶ 95–104.) Defendants first argue that Plaintiff has not identified its trade secrets with sufficient specificity to support a claim for misappropriation under the NCTSPA. (ECF No. 8, at pp. 14–16.) Defendants also contend that Plaintiff does not allege the act or acts by which Defendants misappropriated any trade secrets. (*Id.* at pp. 15–16.)

56.     Under the NCTSPA, "misappropriation" is defined as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." G.S. § 66-152(1). A "Trade Secret" is:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

G.S. § 66-152(3).

57. The courts consider the following factors in determining whether information constitutes a trade secret:

(1) The extent to which [the] information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; ([4]) the value of information to [the] business and its competitors; ([5]) the amount of effort or money expended in developing the information; and ([6]) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997).

58. To survive a motion to dismiss, a plaintiff's complaint "must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether [misappropriation] has or is threatened to occur." *VisionAir, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004); *AYM Techs., LLC. v. Rodgers*, 2018 NCBC LEXIS 14, at *36–37 (N.C Super. Ct. Feb. 9, 2018) (quoting *VisionAir*).

The complaint also must set forth with sufficient specificity the acts by which the alleged misappropriation occurred. *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 327, 660 S.E.2d 577, 586 (2008) ("These allegations do not identify with sufficient specificity either the trade secrets [p]laintiffs allegedly misappropriated *or the acts by which the alleged misappropriations were accomplished*" (emphasis added).); *see also, Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at *9 (N.C. Super. Ct. Oct. 21, 2016) (citing *Washburn*).

59.     Defendants focus on Plaintiff's inclusion of "customers' names and addresses" as part of its alleged trade secrets, and argue that such information by itself generally does not constitute a trade secret. (ECF No. 8, at pp. 14–15.)  Plaintiff, however, has not alleged that its trade secrets consist only of its customer names and contact information.  Although the Complaint is vague in this regard,  read liberally in favor of Plaintiff, the Complaint and the attached Restrictive Agreements appear to allege that Plaintiffs trade secrets include, *inter alia*:

> Information concerning Wells Fargo's customers and the details of their insurance needs and policies, including but not limited to information concerning Wells Fargo's customers and the details of their insurance needs and policies, including but not limited to, customer policies, insurance application information, policy cost information, payment information, profit loss statements, insurance schedules, certificate of holder lists, underwriting information, detailed customer information, detailed employee information, detailed property information, customer financial information, expiration dates of insurance policies and insurance daily reports.

(ECF No. 3, at ¶ 17);

> The books, files, electronic data, and all other records of Wells Fargo, the confidential information contained in [the

records], and especially the data pertaining to Wells Fargo customers, such as customers' names and addresses, as well as additional information such as customers' social security numbers, account numbers, financial status, and other highly confidential personal and financial information[.]

(*Id.* at ¶ 97); and,

[T]he names, addresses, and contact information of the Company's customers and prospective customers, as well as any other personal or financial information relating to any customer or prospect, including, without limitation, account numbers, balances, portfolios, maturity and/or expiration or renewal dates, loans, policies, investment activities, purchasing practices, insurance, annuity policies and objectives[.]

(*Id.*, Exs. 1 and 2, at sec. II.)

60. Within these sprawling lists, there are particular pieces of information that might constitute trade secrets, including: "insurance application information, policy cost information, payment information, profit loss statements, insurance schedules, certificate of holder lists, [and] underwriting information"; "expiration dates of insurance policies and insurance daily reports"; "customers' social security numbers, account numbers, [and] financial status"; and "maturity and/or expiration or renewal dates, loans, . . . investment activities, purchasing practices, [and], annuity policies and objectives." (*Id.*) In addition, while not expressly pleaded, this information, if compiled in a database or other form for each of Plaintiff's customers, might also constitute a trade secret. This Court has held that "where an individual maintains a compilation of detailed records over a significant period of time," such that they have particular value as a compilation or manipulation of information, "those records could constitute a trade secret even if 'similar information may have

been ascertainable by anyone in the . . . business.'" *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at \*13 (N.C. Super. Ct. May 1, 2015) (quoting *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376, 542 S.E.2d 689, 692 (2001)). *See also, State ex rel. Utils. Comm'n v. MCI Telecomms., Corp.,* 132 N.C. App. 625, 634, 514 S.E.2d 276, 282 (1999) (concluding that a "compilation of information" involving customer data and business operations which has "actual or potential commercial value from not being generally known" is sufficient to constitute a trade secret under the NCTSPA); *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at \*31–32 (N.C. Super. Ct. Feb. 18, 2016); *Red Valve v. Titan Valve*, 2018 NCBC LEXIS 41, at \*27 (N.C. Super. Ct. Apr. 17, 2018) (citing *Koch*, *Byrd's*, and *RoundPoint*).

61.    The Court concludes that the allegations in this case, read generously, are minimally sufficient to put Defendants on notice of the trade secrets that they have allegedly misappropriated.

62.    Defendants next argue that the claims for misappropriation must be dismissed because Plaintiff fails to allege facts regarding the means by which Defendants misappropriated Plaintiff's trade secrets. (ECF No. 8, at pp. 15–16.) With regard to Pack and BB&T, the Court agrees. Misappropriation requires the "acquisition, disclosure, or use of a trade secret without express or implied authority or consent." G.S. § 66-152(1). Plaintiff does not allege any acts by which Pack and BB&T allegedly misappropriated trade secrets. While Plaintiff alleges that Pack "had access to" Wells Fargo's trade secret information while she was employed, there

is no allegation that Pack accessed or acquired trade secrets at any time when she was not authorized to do so. Plaintiff also fails to allege facts that would show Pack disclosed or used Wells Fargo's trade secrets, or that any particular customers for whom Pack was responsible have diverted their business from Wells Fargo to BB&T.

63. In sum, the Complaint does not allege facts to support an allegation of misappropriation against Pack, and the claim against her must be dismissed. Defendants' motion to dismiss the misappropriation of trade secrets claims against Pack in Count Five of the Complaint therefore should be GRANTED.

64. Plaintiff also fails to allege facts that support its claim that BB&T misappropriated Wells Fargo's trade secrets. Plaintiff does not allege that Link, Raynor, or Pack disclosed Wells Fargo's trade secrets to BB&T or that BB&T acquired Wells Fargo's trade secrets by some other means. Nor does Wells Fargo claim that BB&T has used Wells Fargo's trade secrets, alleging only that "[u]pon information and belief, *Individual Defendants* have used Wells Fargo's . . . Trade Secrets to identify, contact, solicit, and induce Wells Fargo's clients." (ECF No. 3, at ¶ 56; emphasis added.) Instead, Plaintiff alleges only that "[u]pon information and belief, the Defendants have misappropriated Wells Fargo's trade secret information in order to unfairly compete against Wells Fargo and solicit its customers." (*Id.* at ¶ 102.) The Court is not required to accept Wells Fargo's conclusory speculation regarding BB&T's alleged misappropriation of trade secrets. *Washburn*, 190 N.C. App. at 327, 660 S.E.2d at 586 (affirming dismissal of misappropriation claim and holding "Defendant's allegation that it 'believes [Plaintiffs] used its trade secrets' is general

and conclusory"). Defendants' motion to dismiss the misappropriation of trade secrets claims against BB&T in Count Five of the Complaint therefore should be GRANTED.

65. Plaintiff's allegations in support of its claim that Link misappropriated trade secrets are weak, at best. Plaintiff does not expressly allege that Link ever accessed Wells Fargo's trade secrets without authorization or consent. To the contrary, Plaintiff alleges that Link had access to trade secret information only "by way of his employment with Wells Fargo." (ECF No. 3, at ¶ 96.) The Complaint does not allege that Link downloaded, copied, or otherwise removed from Wells Fargo any trade secret information, nor that Link has disclosed trade secrets to BB&T or anyone else. Instead, Plaintiff alleges only that Link had access to Wells Fargo's trade secret information during his employment with Wells Fargo, that Link became employed by BB&T, that some Wells Fargo customers for whom Link was responsible have transferred their business to BB&T, and "upon information and belief" Link has used Wells Fargo's trade secret information to solicit these customers. A significant inferential leap is required from those alleged facts to conclude that Link misappropriated trade secrets.

66. Nevertheless, the Court is mindful that Plaintiff is entitled to have inferences drawn in its favor at this stage of the proceedings. Accordingly, the Court concludes that the claim for misappropriation of trade secrets against Link should survive dismissal. Therefore, Defendants' motion to dismiss the misappropriation of trade secrets claims against Link in Count Five of the Complaint should be DENIED.

67. Plaintiff's allegations that Raynor, immediately prior to submitting his resignation, entered Plaintiff's offices after hours, and downloaded and copied documents that, on information and belief, contained Plaintiff's trade secrets, sufficiently alleges the acts by which Raynor misappropriated trade secrets. Therefore, Defendants' motion to dismiss the misappropriation of trade secrets claims against Raynor in Count Five of the Complaint should be DENIED.

### E. Tortious interference with contractual relations (Count Seven)

68. As its seventh claim, Plaintiff makes claims for tortious interference with contract against all Defendants, alleging that they each interfered with the Restrictive Agreements between Wells Fargo and Link and Raynor, respectively. (ECF No. 3, at ¶¶ 110–15.)

69. To state a claim for tortious interference with contract, a plaintiff must allege: "(1) a valid contract between plaintiff and a third party which confers upon the plaintiff a contractual right against a third party; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so he acts without justification; (5) resulting in actual damage to the plaintiff." *Kuykendall*, 322 N.C. at 661, 370 S.E.2d at 387 (citing *Childress v. Abeles*, 240 N.C. 667, 674, 84 S.E.2d 176, 181–82 (1954)).

70. As a preliminary matter, the Court has already concluded that Plaintiff's claims for breach of the non-solicitation of customers and non-solicitation of employees covenants in sections III.a., III.b. and III.c. of the Restrictive Agreements should be dismissed because those covenants are invalid and

unenforceable. Since no valid contract existed based on these covenants, Plaintiff's claims that the Defendants interfered with those covenants in the Restrictive Agreements must also fail. *Medical Staffing Network, Inc.*, 194 N.C. App. at 658, 670 S.E.2d at 328 (affirming dismissal of tortious interference claim where trial court had found restrictive covenants overbroad and unenforceable). Accordingly, Defendants' motion to dismiss the claims for tortious interference in Count Seven of the Complaint claiming interference with the covenants not to solicit customers and employees should be GRANTED.

71. Similarly, to the extent that Plaintiff attempts to make a claim for tortious interference with contract based on Defendants' alleged interference with the return of property provisions in Restrictive Agreement, the Court has dismissed the claim for breach of this provision as against Link. In addition, the Complaint does not plead any facts to support an allegation that Link, Pack, or BB&T engaged in any conduct intended to induce Raynor's alleged breach of the return of property provisions. Defendants' motion to dismiss the claims for tortious interference in Count Seven of the Complaint claiming interference with the return of property provisions should be GRANTED.

72. This leaves only the claim that Defendants intentionally interfered with the confidential information covenants in the Restrictive Agreements. With regard to this claim, the Complaint fails to plead any facts to support an allegation that Pack interfered with the Restrictive Agreements between Wells Fargo and Link and

Raynor. The claim against Pack for tortious interference fails and should be dismissed.

73. Defendants contend that the claim for tortious interference against BB&T should be dismissed because Plaintiff does not plead facts in support of the allegation that BB&T intentionally induced Link or Raynor to breach the Restrictive Agreements. (ECF No. 8, at p. 17.) Defendants also argue that the claim for tortious interference against BB&T fails because the allegations in the Complaint establish that Wells Fargo and BB&T are competitors, but Plaintiff does not allege facts supporting the conclusory claim that BB&T acted without justification in interfering with the Restrictive Agreements. (*Id*. at pp. 17–18.) The Court agrees with Defendants on both contentions.

74. First, as with Pack, the Complaint does not contain a single allegation of fact that BB&T engaged in any conduct designed to interfere with the Restrictive Covenants. Unlike the vast majority of cases that arise in this context, Plaintiff does not allege that BB&T recruited Link and Raynor as part of a campaign to raid Wells Fargo's sales force, that BB&T encouraged Link and Raynor to secretly acquire Wells Fargo's confidential information, nor that BB&T directed Link and Raynor to target their former Wells Fargo customers and solicit their commercial insurance business. Rather, Plaintiff alleges only that Link and Raynor resigned from Wells Fargo, became employed with BB&T, and subsequently diverted several customers from Wells Fargo to BB&T. These allegations do not sufficiently state that BB&T intentionally interfered with the Restrictive Covenants.

75. In addition, Wells Fargo and BB&T were competitors in the commercial insurance industry. The North Carolina Supreme Court has held that if the defendant's interference is "for a legitimate business purpose, his actions are privileged. . . . [C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interest and by means that are lawful." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988). This "privilege [to interfere] is conditional or qualified; that is, it is lost if exercised for a wrong purpose. In general, a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Id.* at 220, 367 S.E.2d at 650.

76. "If the defendant's only motive is a malicious wish to injure the plaintiff, [defendant's] actions are not justified." *Hooks*, 322 N.C. at 221, 367 S.E.2d at 650. The malice required to overcome a justification of business competition is legal malice, and not actual malice. *Childress*, 240 N.C. at 675, 84 S.E.2d at 182 ("It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case for the recovery of compensatory damages against the outsider for tortiously inducing the breach of the third person's contract with the plaintiff. The term 'malice' is used in this connection in its legal sense, and denotes the intentional doing of the harmful act without legal justification."); *Murphy v. McIntyre*, 69 N.C. App. 323, 328–29, 317 S.E.2d 397, 401 (1984) (noting that legal malice "means intentionally doing a wrongful act or exceeding one's legal right or

authority in order to prevent the making of a contract between two parties" and the act "must be taken with the design of injuring one of the parties to the contract or of gaining some advantage at the expense of a party"); *Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 318, 498 S.E.2d 841, 851 (1998) ("A person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties.").

77.     In order to survive dismissal, a complaint alleging tortious interference "must admit of no motive for interference other than malice." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832–33 (2007); *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001) ("[W]e have held that the complaint must admit of no motive for interference other than malice."); *Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *16 (N.C. Super. Ct.   Mar. 27, 2017) (holding "[t]he pleading standards for a tortious interference with contract claim are strict. The complaint must admit of no motive for interference other than malice. When the complaint reveals that the interference was justified or privileged, this Court must grant a motion" to dismiss (citations and quotations omitted)).

78.     Here, Plaintiff has alleged that the Defendants, including BB&T, acted "without justification", but does not plead facts supporting a claim that BB&T acted with malice or for any improper purpose, nor that BB&T was motivated by anything other than an interest in successfully competing against Wells Fargo. (ECF No. 3, at ¶ 113.)  The recruitment of employees from a business competitor is presumptively

privileged competitive activity, absent an allegation of legal malice. *Hooks*, 322 N.C. at 221, 367 S.E.2d at 650. The claim for tortious interference as against BB&T fails and should be dismissed.

79. With regard to the claims against Link and Raynor for tortious interference with the confidentiality covenants in the Restrictive Agreements, Plaintiff has not alleged facts to support an allegation that Raynor induced Link to violate his confidentiality covenant. To the contrary, Raynor resigned his employment with Wells Fargo over five months *after* Link left Wells Fargo and became employed with BB&T, and Plaintiff offers no explanation as to why Raynor would encourage Link to violate confidentiality restrictions while both were still employed with Wells Fargo. The allegations do not support a claim for tortious interference with the confidentiality covenants against Raynor. Therefore, the tortious interference with contract claim based on these allegations fails and should be dismissed.

80. With regard to Link, Plaintiff alleges that "Raynor told his manager at Wells Fargo that [ ] Link encouraged him to leave Wells Fargo for BB&T." (ECF No. 3, at ¶ 41.) While this is not an express allegation that Link encouraged Raynor to also violate his confidentiality covenant, the Court concludes that the allegation arguably would support the claim for tortious interference against Link, and Plaintiff's claim that Link tortiously interfered with the confidentiality covenant in Raynor's Restrictive Agreement.

81. Therefore, Defendants' motion to dismiss Count Seven for tortious interference with contractual relations is DENIED as to Plaintiff's claim that Link interfered with the confidentiality covenant in Raynor's Restrictive Agreement. Defendants' motion to dismiss Count Seven for tortious interference with contractual relations as to all other Defendants and claims is GRANTED, and such claims are DISMISSED.

### F. Unfair and deceptive trade practices (Count Eight)

82. As its Eighth claim, Plaintiff alleges that all Defendants have engaged in unfair and deceptive acts or practices in violation of G.S. § 75-1.1. (ECF No. 3, at ¶¶ 116–120.) Plaintiff specifically alleges that

> Defendants' wrongful acts, include[e] but [are] not limited to, Defendants' misappropriation of trade secrets, conspiracy and fraudulent scheme to divert business opportunities away from Wells Fargo, theft of company property to gain an unfair advantage, interference with Defendant Link and Defendant Raynor's contractual obligations owed to Wells Fargo, and other deceptive, unethical and unscrupulous conduct[.]

(ECF No. 3, at ¶ 117.)

83. "To establish a prima facie case of unfair and deceptive trade practices, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice, (2) the act was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 303, 603 S.E.2d 147, 161 (2004).

84. Defendants correctly point out that the facts pleaded in the Complaint do not support allegations of a "conspiracy and fraudulent scheme to divert business

opportunities away from Wells Fargo." Plaintiff does not make claims for fraud or conspiracy, and there are no facts alleged that would support such claims. Plaintiff makes no argument in support of these allegations, and the claim for unfair and deceptive trade practices cannot be based on such conduct.

85. In addition, the underlying claims against Pack and BB&T for misappropriation of trade secrets and intentional interference with contract have been dismissed. Plaintiff does not allege, nor argue, that Pack or BB&T engaged in any other conduct that would support a claim for unfair trade practices. Therefore, Defendants' motion to dismiss the claims against Pack and BB&T for unfair and deceptive trade practices in Count Eight of the Complaint should be GRANTED.

86. With regard to the claims against Link and Raynor, "[a] violation of the [NCTSPA] constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1." *Medical Staffing Network, Inc.*, 194 N.C. App. at 659, 670 S.E.2d at 329 (citing N.C. Gen. Stat. § 66-146(2007)). Since Plaintiff's claims against Link and Raynor for misappropriation of trade secrets survive dismissal, so must the claims for violation of G.S. § 75-1.1. Defendants' motion to dismiss the claims against Link and Raynor for unfair and deceptive trade practices in Count Eight of the Complaint should be DENIED.

## III.  CONCLUSION

THEREFORE, IT IS ORDERED that Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part, as follows:

1. Defendants' motion to dismiss Plaintiff's First and Second Counts for breach of contract are GRANTED, and the claims are DISMISSED.

2. Defendants' motion to dismiss Plaintiff's Count Three for breach of contract against Link is DENIED.

3. Defendants' motion to dismiss Count Four for breach of contract against Link is GRANTED, and the claim is DISMISSED.

4. Defendants' motion to dismiss Count Five for misappropriation of trade secrets against Pack and BB&T is GRANTED, and those claims are DISMISSED.

5. Defendants' motion to dismiss Count Five for misappropriation of trade secrets against Link and Raynor is DENIED.

6. Defendants' motion to dismiss Count Seven for tortious interference with contractual relations is DENIED as to Plaintiff's claim that Link interfered with the confidentiality covenant in Raynor's Restrictive Agreement.

7. Defendants' motion to dismiss Count Seven for tortious interference with contractual relations as to all other Defendants and claims is GRANTED, and those claims are DISMISSED.

8. Defendants' motion to dismiss the claims against Pack and BB&T in Count Eight for unfair and deceptive trade practices is GRANTED, and those claims are DISMISSED.

9. Defendants' motion to dismiss the claims against Link and Raynor in Count Eight for unfair and deceptive trade practices is DENIED.

This, the 8th day of May, 2018.

                                        /s/ Gregory P. McGuire
                                        Gregory P. McGuire
                                        Special Superior Court Judge
                                        for Complex Business Cases