Maven Advantage, Inc. v. Square One Storm Restoration, LLC, 2025 NCBC 14.

STATE OF NORTH CAROLINA

WAKE COUNTY

MAVEN ADVANTAGE, INC.,

        Plaintiff,

v.

SQUARE ONE STORM
RESTORATION, LLC, d/b/a
SQUARE ONE RESTORATION,
LLC; WILLIAM C. COUCH; and
TYLER N. DANIELS,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV036621-910


**ORDER AND OPINION ON
DEFENDANTS' PARTIAL MOTION TO
DISMISS**

**THIS MATTER** is before the Court on Defendants Square One Storm

Restoration, LLC ("Square One"), William C. Couch, and Tyler N. Daniels'

(collectively, "Defendants") Partial Motion to Dismiss Pursuant to N.C.R. Civ. P.

12(b)(6) (the "Motion to Dismiss" or the "Motion," ECF No. 20).

**THE COURT**, having considered the Motion to Dismiss, the parties' briefs,

the arguments of counsel, the applicable law, and all appropriate matters of record,

**CONCLUDES** that Defendants' Motion to Dismiss should be **GRANTED in part**

and **DENIED in part**, as set forth below.

> *Poyner Spruill LLP, by N. Cosmo Zinkow, Stephanie Gumm, and Clare
> W. Magee, for Plaintiff Maven Advantage, Inc.*
>
> *Morningstar Law Group, by Harrison M. Gates, for Defendants Square
> One Storm Restoration, LLC, d/b/a Square One Restoration, LLC,
> William C. Couch, and Tyler N. Daniels.*

Davis, Judge.

## INTRODUCTION

1.  In this lawsuit, the plaintiff, a roofing services company, contends that two of its former employees unlawfully stole its confidential information and trade secrets in order to solicit business on behalf of their new employer in violation of applicable laws and existing contractual agreements between the parties.

## FACTUAL AND PROCEDURAL BACKGROUND

2.  The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached to, referred to, or incorporated by reference in, the complaint) that are relevant to the Court's determination of the motion. *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

3.  Plaintiff Maven Advantage, Inc. ("Maven") is a company that provides roofing and storm restoration services to customers in eastern North Carolina. (Compl. ¶¶ 19–20, ECF No. 3.)

4.  Maven is incorporated in North Carolina and maintains its principal place of business in Hampstead. (Compl. ¶ 12.)

5.  Defendants William Couch and Tyler Daniels are both North Carolina residents who were formerly employed as sales representatives by Maven until they resigned on 4 October 2024. (Compl. ¶¶ 6, 14–15, 23–24.)

6.  As a condition of their employment, Couch and Daniels each entered into Employee Non-Solicitation, Non-Competition, and Non-Disclosure Agreements

("Employment Agreements") on 23 September 2022 and 12 March 2024, respectively. (Compl. ¶¶ 23–24, Exs. B, C.)

7.     Maven's Employment Agreements include a number of provisions that seek to prohibit certain conduct during and after an employee's employment with the company.   For example, the Employment Agreements include a Non-Disclosure provision addressing the unauthorized disclosure or use of Maven's confidential information, along with Non-Competition and Non-Solicitation provisions.   (*See* Compl., Exs. B, C.)

8.     As part of its business model, Maven conducts free roof inspections for prospective customers and generates "detailed inspection report[s]" that describe "information about [each] roof's condition, any existing problems, and recommendations for necessary repairs."   (Compl. ¶ 21.)   Following the initial inspections, Maven's sales representatives use the information compiled in the reports to "finalize[] contracts with the property owners to provide roof repairs or replacement[s]." (Compl. ¶ 22.)

9.     In or around September 2024, Maven began to experience "an unusual down[ward] trend in its sales." (Compl. ¶¶ 29–30.) Specifically, when compared with the prior month, over one hundred fewer prospective customers scheduled roof inspections with the company.   (Compl. ¶¶ 31–32.)   Furthermore, of the 273 prospective customers who scheduled their initial roof inspections during September 2024, 31% of them cancelled.  (Compl. ¶ 32.)

10. Maven contends that many of the prospective customers that it lost in September 2024 were previously assigned to Couch and Daniels. (Compl. ¶ 34.)

11. During the early morning hours of 4 October 2024, Couch and Daniels—without any advance warning to Maven personnel—ended their employment by returning their company-owned vehicles and equipment to Maven's office. (Compl. ¶¶ 35–36.) On or around that same date, Couch and Daniels began working for one of Maven's competitors—Square One. (Compl. ¶ 36.)

12. Upon investigating their abrupt departures, Maven allegedly uncovered evidence of an ongoing scheme by Couch and Daniels to "divert[] Maven's business pipeline to Square One." (Compl. ¶ 38.)

13. Maven contends that, in furtherance of this scheme, Couch and Daniels improperly persuaded a number of its existing customers to switch their business from Maven to Square One. (*See* Compl. ¶¶ 38–47.)

14. Maven further asserts that this scheme began while Couch and Daniels were still employed at Maven, pointing to several online reviews posted by former Maven customers (or prospective customers) lauding work performed by Couch and Daniels on behalf of Square One prior to (or very shortly after) the date of their resignation from Maven. (Compl. ¶¶ 39–40.)

15. Maven alleges that Couch and Daniels' efforts to siphon business from the company were effectuated by their misappropriation of the company's proprietary information. (*See* Compl. ¶ 44.)

16. For example, on 28 September 2024, Maven asserts that Couch used his company email to "send a confidential customer list from Maven's commission software to his personal email address." (Compl. ¶ 44.)

17. Additionally, on 8 October 2024, Daniels contacted a Maven employee via text message to ask for specific information about one of Maven's existing customers. (Compl. ¶ 44.)

18. In an effort to "mitigate" the impacts of Couch and Daniels' actions, Maven allegedly "began contacting all the [customer] leads originally assigned to" Couch and Daniels. However, these efforts were "too late" because "[n]umerous homeowners had either cancelled their contracts with Maven or became unresponsive after receiving follow-up calls." (Compl. ¶ 45.)

19. Maven filed a verified Complaint in Wake County Superior Court on 14 November 2024, asserting claims against Couch, Daniels, and Square One for unfair and deceptive trade practices under N.C.G.S. § 75-1.1, common law unfair competition, misappropriation of trade secrets, tortious interference with contract, and tortious interference with prospective economic advantage. Maven's Complaint also asserted a claim against Couch and Daniels for breach of contract and a claim against Daniels for civil embezzlement. (Compl. ¶¶ 48–93.)

20. On 20 November 2024, this matter was designated as a mandatory complex business case and assigned to the Honorable Adam Conrad. (ECF Nos. 1, 2.) On 22 November 2024, the case was reassigned to the undersigned. (ECF No. 14.)

21. Defendants filed the present Motion to Dismiss on 20 December 2024 seeking dismissal of Maven's claims for misappropriation of trade secrets against all Defendants, breach of contract against Couch and Daniels, and civil embezzlement against Daniels.

22. The Court held a hearing on the Motion to Dismiss on 6 February 2025 at which counsel for all parties were present.

23. The Motion to Dismiss has been fully briefed and is now ripe for resolution.

**LEGAL STANDARD**

24. In ruling on a motion to dismiss under Rule 12(b)(6), the Court may only consider the pleading and "any exhibits attached to the complaint[,]" *Krawiec v. Manly*, 370 N.C. 602, 606 (2018), in order to determine whether "as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some recognized legal theory." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus., Inc.*, 336 N.C. 438, 442 (1994) (cleaned up). The Court must view the allegations in the complaint "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017) (cleaned up).

25. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's

claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cnty.*, 355 N.C. 161, 166 (2002)).

## ANALYSIS

### I.  Civil Embezzlement

26.  Maven has informed the Court that it no longer intends to proceed on this claim.

27.  Therefore, Maven's claim for civil embezzlement is **DISMISSED** with prejudice.

### II.  Misappropriation of Trade Secrets

28.  North Carolina's Trade Secrets Protection Act (the "Act") provides that "[t]he owner of a trade secret shall have [a] remedy by civil action for misappropriation of his trade secret." N.C.G.S. § 66-153.

29.  The Act defines a "trade secret" as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

    a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

    b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

30.  Additionally, the Act defines "misappropriation" as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or

consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1).

### A. Identification of Trade Secrets

31. As an initial matter, Defendants argue that the Complaint—on its face—fails adequately to identify any information that could qualify as a trade secret under the Act. *See MarketPlace 4 Ins., LLC v. Vaughn*, 2023 NCBC LEXIS 31, at **23 (N.C. Super. Ct. Feb. 24, 2023) ("[A] threshold question in any action involving such a claim is whether the information at issue actually constitutes a trade secret under the Act.").

32. Our Supreme Court has stated its approval of our Court of Appeals' holding that "[t]o plead misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec*, 370 N.C. at 609 (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326 (2008)). Moreover, "a complaint that makes general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated, is insufficient to state a claim for misappropriation of trade secrets." *Id.* at 610 (quoting *Washburn*, 190 N.C. App. at 327) (cleaned up).

33. This Court has made clear that broad allegations regarding the alleged misuse of "customer lists, customer contract information, pricing information, and

product information" are insufficient to state a claim for misappropriation of trade secrets. *Aecom Tech. Corp. v. Keating*, 2012 NCBC LEXIS 9, at **8 (N.C. Super. Ct. Feb. 6, 2012); *see also Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at **68 (N.C. Super. Ct. Nov. 3, 2011) (finding complaint alleging misappropriation of "Akzo Nobel's proprietary formulas, methodologies, customer and pricing data and other confidential information" to be too "sweeping and conclusory . . . to identify the trade secrets the Individual Defendants [were] accused of misappropriating").

34.    Here, the bulk of the allegations that purport to describe the specific company information forming the basis for Maven's misappropriation of trade secrets claim are contained in paragraph 66 of Maven's Complaint, which states, in its entirety:

> Maven maintains detailed lists of customers that include inspection dates, assigned sales representatives, contract amounts, dates of contact, deal stage information, and other valuable confidential information that enable Maven to derive potential and actual economic value from its use.

(Compl. ¶ 66.)

35.    The Court concludes that, based on *Krawiec* and the relevant case law from this Court, these allegations fall short of satisfying the pleading standard for a misappropriation of trade secrets claim.

36.    At the 6 February hearing, counsel for Maven urged the Court to consider paragraphs 21, 78, and 79 of its Complaint as additional allegations that could identify a protectable trade secret. These paragraphs read as follows:

> As part of its business model, Maven provides free roof inspections for homeowners and commercial property owners. Maven team members

evaluate roofs and generate a detailed inspection report that includes information about the roof's condition, any existing problems, and recommendations for necessary repairs.

. . .

Maven cultivated business relationships with no less than seventy-five third-party homeowners to provide roofing services. These business relationships advanced to the point that Maven was able to calculate precise estimates of the costs to conduct roof repairs and replacements for these prospective customers.

Mr. Couch and Mr. Daniels knew of these business relationships by virtue of their employment with Maven, and upon information and belief, Square One knew of these business relationships by hiring Mr. Couch and Mr. Daniels and wrongfully assisting them to use these leads.

(Compl. ¶¶ 21, 78–79.)

37.    None of the allegations in these paragraphs, however, identify actual (or potential) trade secrets.  The Court has thoroughly reviewed Maven's Complaint in its entirety and concludes that Maven has failed to satisfy the above-described pleading requirements for misappropriation of trade secrets claims.

38.    On this ground alone, the granting of Defendants' Motion to Dismiss Maven's misappropriation of trade secrets claim would be proper.  However, as discussed below, Maven's allegations as to the misappropriation element are likewise deficient and serve as an additional basis for the dismissal of this claim.

**B. Misappropriation**

39.    With respect to a plaintiff's obligation to allege either actual or threatened misappropriation of a trade secret, N.C.G.S. § 66-155 explains:

Misappropriation of a trade secret is prima facie established by the introduction of substantial evidence that the person against whom relief is sought both:

(1) Knows or should have known of the trade secret; and

(2) Has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner.

This prima facie evidence is rebutted by the introduction of substantial evidence that the person against whom relief is sought acquired the information comprising the trade secret by independent development, reverse engineering, or it was obtained from another person with a right to disclose the trade secret.

N.C.G.S. § 66-155.

40. Maven asserts that the allegations contained in paragraph 44 of its Complaint are sufficient to allege misappropriation. The Court disagrees.

41. Paragraph 44 reads as follows:

Indeed, Mr. Couch and Mr. Daniels continued to take obvious and intentional steps to wrongfully siphon business away from Maven. On September 28, 2024, Mr. Couch used his Maven company email to send a confidential customer list from Maven's commission software to his personal email address. And on October 8, 2024, Mr. Daniels texted a Maven employee in an attempt to obtain confidential information regarding an existing Maven customer.

(Compl. ¶ 44.)

42. With respect to Maven's allegations concerning Couch's 28 September 2024 email, the Court has already determined that a mere customer list does not—without more—qualify as a trade secret.

43. The allegation regarding Daniels' 8 October 2024 text exchange fares no better as it merely alleges that Daniels *attempted* to obtain certain information from a Maven employee—not that he was actually *successful* in obtaining it. Moreover, that allegation simply refers in conclusory fashion to "confidential

information" rather than attempting to assert that Daniels sought to obtain an actual trade secret from the other Maven employee.

44.     As a result, the Court concludes that Maven's Complaint fails to satisfy the misappropriation element of this claim.  *See Washburn*, 190 N.C. App. at 327 (affirming trial court's dismissal of trade secret misappropriation claim where act of misappropriation was pled using "general and conclusory" allegations); *Bite Busters, LLC v. Burris*, 2021 NCBC LEXIS 26, at **22–23 (N.C. Super. Ct. Mar. 25, 2021) ("Despite satisfying its burden to sufficiently plead its customer list trade secret, however, Bite Busters' trade secret claim nonetheless fails because the Company has failed to allege the acts by which the alleged misappropriations were accomplished." (cleaned up)); *Strata Solar, LLC v. Naftel,* 2020 NCBC LEXIS 129, at **11–12 (N.C. Super. Ct. Oct. 29, 2020) (dismissing trade secret misappropriation claim because Plaintiff failed to "allege any specific acts . . . to show that [defendants] accessed, disclosed, or used Plaintiff's trade secrets without Plaintiff's authorization[,]" and "[t]he Court [was] not required to accept Plaintiff's conclusory allegations regarding [the] alleged misappropriation of Plaintiff's trade secrets").

45.     Therefore, for all of these reasons, Maven's claim for misappropriation of trade secrets is **DISMISSED** with prejudice.

## III.    Breach of Contract

46.     Maven's breach of contract claim is premised upon Couch and Daniels' alleged breaches of certain provisions contained in their Employment Agreements with Maven.

47.     As previously discussed, the Employment Agreements contain separate Non-Competition and Non-Solicitation provisions, each of which Defendants assert is overly broad under North Carolina law and therefore unenforceable.[1] In addition, Defendants contend that Maven has failed adequately to allege a breach of the Non-Disclosure provision.

## A. Non-Competition Agreement

48.     As an initial matter, Maven concedes in its response brief that the Non-Competition provision of the Employment Agreements—as written—is unenforceable under North Carolina law due to its overbreadth. (Pl.'s Br. Opp'n Defs.' Partial Mot. Dismiss, at 19 n.6, ECF No. 29.)

49.     Therefore, the Court **DISMISSES** with prejudice the portion of Maven's breach of contract claim alleging a violation of the Non-Competition provision of the Employment Agreements.

## B. Non-Solicitation Agreement

50.     The "Non-Solicitation" provision reads—in relevant part—as follows:

l.     ***Non-Solicitation***. In consideration of continued employment with the Company, for a period of twelve (12) months following the termination of Employee's employment with the Company, for any reason, the Employee will not directly or indirectly, whether as an employee, agent, consultant, independent contractor, owner, partner or otherwise:

  a) Solicit any customer of the Company with whom Employee actually did business and had personal contact while employed with the Company for the purpose of obtaining the business of such customer in competition with the Company.

---

[1] Although Couch and Daniels' respective Employment Agreements are formatted differently, they are substantively identical. For this reason, the Court will address them together in analyzing Defendants' arguments.

b) Advise or recommend to any other person that such person solicit any customer of the Company with whom Employee actually did business and had personal contact while employed by Company, for the purpose of obtaining the business of such customer, in competition with the Company.

c) Employ, solicit for employment, or advise or recommend to any other person that such person solicit for employment or employ any person employed by the Company.

(Compl. Ex. B § 1, Ex. C § 1.)

51. Defendants contend that all three of these subparts are unenforceable because each of them is overly broad based on the prior decisions from North Carolina courts on this subject.

52. In response, Maven concedes that subpart (c) of the Non-Solicitation provision is overbroad but argues that subparts (a) and (b), conversely, are enforceable. Maven further contends that the Court should sever subpart (c) from the Non-Solicitation provision pursuant to the "blue pencil" rule and enforce the remaining two subparts.

53. Defendants, in turn, dispute the applicability of the blue pencil rule under these circumstances. Alternatively, they assert that even if subpart (c) could, in fact, be blue-penciled out of the Non-Solicitation provision, it would not matter because subparts (a) and (b) are equally unenforceable on their own.

54. The Court will take these arguments in turn.

55. North Carolina courts have adopted a "'strict blue pencil doctrine' [whereby they] cannot rewrite an unenforceable covenant; instead, to avoid scrapping an entire covenant, a Court may enforce the divisible parts of a covenant that are

reasonable." *NFH, Inc. v Troutman*, 2019 NCBC LEXIS 66, at *33 (N.C. Super. Ct. Oct. 29, 2019.)

56. The blue pencil doctrine is a rule of "excision, not modification." *Prometheus Grp. Enters., LLC v. Gibson,* 2023 NCBC LEXIS 42, at **18 (N.C. Super. Ct. Mar 21, 2023) ("*Prometheus*"). "A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant." *Id.* at **19 (cleaned up). Moreover, "[t]o be a 'distinctly separable' provision, other restrictions in the covenant must not be dependent on the portion to be excised." *Id.* Application of the blue pencil doctrine is ultimately a matter for the Court's discretion. *Id.*

57. The basis for Defendants' argument that the Court lacks the authority to exercise its blue pencil powers here is their contention that subpart (c) is not a distinctly severable provision. In order to address this argument, the relevant case law provides that resort must be had to punctuation and formatting.

58. The two most instructive cases on this issue are *Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at *22–23 (N.C. Super. Ct. May 8, 2018), *aff'd*, 372 N.C. 260 (2019), and *Prometheus*, 2023 NCBC LEXIS 42, at **18–21.

59. In *Wells Fargo*, this Court declined to blue pencil a contractual provision prohibiting the solicitation of the plaintiff's "customers and prospective customers with whom [Defendants] had 'Material Contact *and/or*' about whom they received 'Confidential Information'[.]" *Wells Fargo Ins. Servs.*, 2018 NCBC LEXIS 42, at *13.

> The Court cannot "blue pencil" the provisions in section III.b. because
> the provision addressing customers about whom Link and Raynor

received "Confidential Information" is not "distinctly separable" from the "Material Contact" provision. The two provisions are not contained in separately numbered paragraphs, separate sentences, or even separated by the word "or." Rather, the provisions are separated by the term "and/or." The use of "and/or" suggests that the prohibitions could be read in both the conjunctive and disjunctive senses, and creates an ambiguity. "When the language in a contract is ambiguous, we view the practical result of the restriction by 'construing the restriction strictly against its draftsman[.]'" *Electrical South, Inc. v. Lewis*, 96 N.C. App. 160, 167, 385 S.E.2d 352, 356 (1989) (citing *Manpower of Guilford County, Inc.* v. [*Hedgecock*], 42 N.C. App. 515, 522, 257 S.E.2d 109, 115 (1979)). In this case, the Court concludes that the term "and/or" must be construed against Wells Fargo and read in the conjunctive sense for the purpose of applying the "blue pencil" doctrine. Under this interpretation, the provision restricting Link and Raynor from soliciting customers about whom they received "Confidential Information" is not clearly separable from the other restrictions in section III.b. and cannot be stricken.

*Id.* at *22–23.

60.     In *Prometheus*, this Court refused to blue pencil a series of geographical restrictions in an Employment Agreement that were "presented as a list, but . . . joined by the conjunctive 'and'–preventing them from being 'distinctly separable.'" *Prometheus Grp. Enters., LLC,* 2023 NCBC LEXIS 42, at **19. Additionally, we declined a request to apply the blue pencil rule to "excise the word 'indirectly' from" a covenant not to "*directly or indirectly* engage in (whether as an employee, consultant, proprietor, partner, director or otherwise), or have any ownership interest in, or participate in the financing, operation, management or control of, any person, firm, corporation or business that engages in a Restricted Business in a Restricted Territory." *Id.* at **3, 20–21 (emphasis added). In so ruling, we stated that

> [d]espite use of the disjunctive "or," the structure of the provision does not clearly establish that the drafter intended for the words in this modifying phrase to be used alternatively. The Court will not exercise

its discretion to blue pencil a provision that was not clearly drafted to be divisible. *Cf. Bev. Sys. of the Carolinas, LLC*, 368 N.C. at 700 ("Allowing litigants to assign to the court their drafting duties as parties to a contract would put the court in the role of scrivener, making judges postulate new terms that the court hopes the parties would have agreed to be reasonable at the time the covenant was executed or would find reasonable after the court rewrote the limitation. We see nothing but mischief in allowing such a procedure.").

*Id.* at \**20–21.

61.     Unlike the provisions discussed above in *Wells Fargo* and *Prometheus*, the three subparts of the Non-Solicitation agreement here are set out sequentially, are separated by periods, and contain a space between the last line of each preceding subpart and the first line of each new subpart. Furthermore, the Employment Agreements also contain a clause specifically titled "Blue Pencil," which states as follows:

> 4. ***Blue Pencil***. Employee acknowledges that the periods and restrictions imposed by this Section 1, 2, and 3 are fair and reasonable and are reasonably required for the protection of the Company. If any part or parts of Sections 1, 2, or 3 shall be held to be unenforceable or invalid, the remaining parts shall nevertheless continue to be valid and enforceable as though the invalid portion or portions were not a part hereof. If any of the provisions of Sections 1, 2, or 3 relating to the periods or restrictions shall be deemed to exceed the maximum periods of time or restrictions which a court of competent jurisdiction would deem enforceable, the times and restrictions shall, for the purposes of Sections 1, 2 and 3, be deemed to be the maximum time periods and restrictions which a court of competent jurisdiction would deem valid and enforceable in any state in which such court of competent jurisdiction shall be convened.

(Compl. Ex. B § 4; Ex. C § 4.)

62.     For all of these reasons, the Court finds that subparts (a), (b), and (c) of the Non-Solicitation agreement are discrete and separable such that application of

the blue pencil doctrine is appropriate. As a result, subpart (c) can be severed from the Non-Solicitation provision.

63. In the alternative, Defendants argue that even if blue penciling is permissible in this instance, subpart (a) of the Non-Solicitation provision is *itself* unenforceable because it is facially overbroad.[2]

64. "Like non-competition provisions, valid non-solicitation provisions must be . . . reasonable both as to the time and territory embraced in the restrictions, fair to the parties, and not against public policy." *Sandhills Home Care, L.L.C. v. Companion Home Care – Unimed, Inc.*, 2016 NCBC LEXIS 61, at **25 (N.C. Super. Ct. Aug. 1, 2016) (cleaned up).

65. This Court has observed that "North Carolina courts are more willing to enforce non-solicitation provisions targeted to the former employer's customers or prospective customers than provisions prohibiting entirely the former employee from working for certain employers or in certain regions." *See id.* at **25.

66. On this issue, Defendants cite cases standing for the proposition that non-solicitation provisions are too broad when they either do not require the employee to have had actual contact with the customers in question or do not specify the extent of such contact. *See, e.g.*, *McGriff Ins. Servs. v. Hudson*, 2023 NCBC LEXIS 4, at *28 (N.C. Super. Ct. Jan. 17, 2023) (finding non-solicitation provision overbroad where employee was prohibited from "soliciting any customer he contacted or served during

---

[2] The Court notes that Defendants' argument as to the unenforceability of subpart (b) is in all respects identical to its argument with regard to subpart (a). Therefore, the Court's analysis of subpart (a) will apply equally to subpart (b).

the entirety of his eleven-plus years of employment with [the employer], no matter how long ago or how fleeting the contact"); *Sandhills Home Care, L.L.C.*, 2016 NCBC LEXIS 61 at **28 (prohibition on "soliciting 'prospective customers' that [employees] personally, or that [employer], solicited for services" was "too broad").

67. However, "[o]ur courts have occasionally found a customer non-solicitation provision to be enforceable without requiring an allegation that the employee had significant contact with the customers at issue . . . in situations where the employer's customer base was defined such that the employee could easily identify those customers that were off-limits." *Elior, Inc. v. Thomas*, 2024 NCBC LEXIS 61, at **33–34 (N.C. Super. Ct. Apr. 22, 2024).

68. Here, subparts (a) and (b) of the Non-Solicitation agreement require both that the Defendants have had "personal contact" with the customer *and* that they "actually did business" with those customers. (Compl., Ex. B §§ 1(a), 1(b); Ex. C §§ 1(a), 1(b).) Moreover, subparts (a) and (b) each clarify that the prohibited solicitation must be specifically made "for the purpose of obtaining the business of such customer in competition with the Company." (Compl., Ex. B §§ 1(a), 1(b); Ex. C §§ 1(a), 1(b).)

69. Neither Defendants' briefs nor the Court's own research has identified any cases from North Carolina courts holding that non-solicitation agreements containing such language are unenforceable.

70. Based on its careful consideration of the language in subparts (a) and (b) of the Non-Solicitation provision coupled with the nature of Maven's business and

Couch and Daniels' positions within the company as described in the Complaint, the Court is satisfied that these provisions are narrowly tailored to protect Maven's legitimate business interests. Accordingly, they survive scrutiny under Rule 12(b)(6).

71. Therefore, Defendants' Motion to Dismiss Maven's breach of contract claim is **GRANTED** to the extent it seeks dismissal of Maven's claim for breach of contract based on subpart (c) of the Non-Solicitation provision of the Employment Agreements, but **DENIED** to the extent it seeks dismissal of Maven's claim for breach of contract based on subparts (a) and (b) of the Non-Solicitation provision of the Employment Agreements.

### C. Non-Disclosure Agreement

72. "A non-disclosure provision in an employment agreement is enforceable if it does not seek to prevent a party from engaging in a similar business in competition with the [employer], but instead seeks to prevent the disclosure or use of confidential information. . . . To be enforceable, such a non-disclosure agreement requires only a showing that it protects a legitimate business interest of the employer; time and durational limitations are irrelevant." *Cnty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *20–22 (N.C. Super. Ct. Sept. 9, 2020) (cleaned up).

73. However, in order "[t]o state a claim for breach of [a] Non-Disclosure Agreement, as in any other contract case—the complaint must allege . . . *the facts constituting the breach*[.]" *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510 (2004) (cleaned up).

74. Here, as noted above, Maven has alleged that Couch used his Maven email address to send a customer list to his own personal email address and that the customer list was confidential. Although—as discussed earlier in this Opinion—this allegation is not sufficient to allege a misappropriation of trade secrets, a document can be confidential (and thus subject to a non-disclosure agreement) even if it does not rise to the level of a trade secret.

75. Therefore, the Court finds that Maven has pled a valid claim for breach of the Non-Disclosure provision of the Employment Agreement against Couch. Accordingly, Defendants' Motion to Dismiss on this issue as to Couch is **DENIED**.

76. With regard to Daniels, however, the Complaint merely states that he attempted to obtain confidential information from a former colleague regarding a Maven customer without any accompanying allegations that Couch was ultimately successful in receiving the information at issue. As a result, this allegation is insufficient to plead a violation of the Non-Disclosure provision.

77. Therefore, Defendants' Motion to Dismiss on this issue as to Daniels is **GRANTED**, and that portion of Maven's breach of contract claim is **DISMISSED**. In its discretion, however, the Court elects to dismiss the breach of Non-Disclosure provision claim against Daniels *without* prejudice. *See First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) ("The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]").

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

a. Defendants' Motion to Dismiss Maven's claim for civil embezzlement is **GRANTED**, and this claim is **DISMISSED** with prejudice.

b. Defendants' Motion to Dismiss Maven's claim for misappropriation of trade secrets is **GRANTED**, and this claim is **DISMISSED** with prejudice.

c. Defendants' Motion to Dismiss Maven's breach of contract claim is **GRANTED** as to Maven's claims for breach of the Non-Competition provision of the Employment Agreements and breach of subpart (c) of the Non-Solicitation provisions of the Employment Agreements, and those portions of Maven's breach of contract claim are **DISMISSED** with prejudice.

d. Defendants' Motion to Dismiss Maven's claim for breach of contract based on subparts (a) and (b) of the Non-Solicitation provision of the Employment Agreements is **DENIED**.

e. Defendants' Motion to Dismiss Maven's claim for breach of the Non-Disclosure provision of the Employment Agreements against Couch is **DENIED**.

f. Defendants' Motion to Dismiss Maven's claim for breach of the Non-Disclosure provision of the Employment Agreements against Daniels is **GRANTED**, and this claim is **DISMISSED** without prejudice.

**SO ORDERED**, this the 24th day of March, 2025.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases