Kadah v. Paladin Drones, Inc., 2026 NCBC 50.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

KHALED KADAH,

        Plaintiff/
Counterclaim-
Defendant,

v.

PALADIN DRONES, INC.,

        Defendant/
Counterclaim-
Plaintiff,

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV050925-590

**ORDER AND OPINION ON MOTION
TO DISMISS AMENDED
COUNTERCLAIMS**

1. This matter is before the Court on plaintiff and counterclaim defendant Khaled Kadah's Rule 12(b)(6) motion to dismiss the amended counterclaims asserted in this action by defendant and counterclaim plaintiff Paladin Drones, Inc. (ECF No. 30).

2. With its amended counterclaims, Paladin asserts causes of action against Kadah for (i) breach of contract, (ii) misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, (iii) misappropriation of trade secrets under the federal Defend Trade Secrets Act, (iv) tortious interference with prospective economic advantage, and (v) defamation. (*See generally* ECF No. 27).

3. Having considered the amended counterclaims, the written arguments of counsel, and applicable law, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Kadah's motion as set forth below.

> *Womble Bond Dickinson (US) LLP, by Mark P. Henriques, Michael Ingersoll, and Philip D. Mayer, for Plaintiff and Counterclaim Defendant Khaled Kadah.*

*Nelson Mullins Riley & Scarborough LLP, by Joseph Matthew Gorga and Jordan Koonts, and Grellas Shah LLP, by Jack Bussell and Dhaivat Shah, for Defendant and Counterclaim Plaintiff Paladin Drones, Inc.*

Houston, Judge.

## I.     BACKGROUND

4.     The Court does not make findings of fact in ruling on a Rule 12(b)(6) motion to dismiss. *See Taylor v. Bank of Am., N.A.*, 382 N.C. 677, 679 (2022). Instead, for background, the Court summarizes the factual allegations of the amended counterclaims that are most relevant to the Court's decision and accepts Paladin's well-pleaded factual allegations as true for purposes of this Order and Opinion. *Estevez v. C&S Com., LLC*, 2025 NCBC LEXIS 166, at *1 (N.C. Super. Ct. Nov. 25, 2025).[1]

5.     Paladin is a Delaware corporation with its principal place of business in Houston, Texas. (ECF No. 27, ¶ 1). Paladin manufactures "high-performance emergency response drones and [has] established itself as a reliable one-stop provider of drones, software, and a data management platform for first responders across the country." (ECF No. 27, ¶ 6).

---

[1] The pleading includes an "Introductory Statement" that spans nearly two full pages and six full, unnumbered paragraphs, (ECF No. 27 at 1–3), and that, thus, does not comply with Rules 8 and 10 of the North Carolina Rules of Civil Procedure. N.C. R. Civ. P. 8(a)(1) (requiring a "short and plain statement of the claim"); N.C. R. Civ. P. 10(b) ("All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which be limited as far as practicable to a statement of a single set of circumstances[.]"). Pleadings are not, and should not be treated like, briefs or novellas. *Cf., e.g.*, N.C. R. Civ. P. 84 (providing examples of appropriate pleading forms).

6.     Kadah, a resident of Mecklenburg County, North Carolina, is a former employee of Paladin. (ECF No. 27, ¶¶ 2, 8, 22). Kadah started his employment with Paladin around 5 September 2023. (ECF No. 27, ¶ 8).

7.     In January 2024, Paladin and Kadah entered into a Confidential Information and Invention Assignment Agreement (the "**Agreement**"), (ECF No. 27.1),[2] whereby Paladin and Kadah agreed that Kadah would comply with certain conditions, including a covenant not to compete, and would keep confidential certain information to which he became privy as a result of his employment with Paladin. (ECF No. 27, ¶¶ 9, 10; ECF No. 27.1).

8.     The confidentiality clause provides, in relevant part:

> (a) **Protection of Information**. I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

---

[2] The agreement at issue is attached to, referenced in, and integral to the amended counterclaims and is properly considered in resolving the motion. *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (citation omitted); *Packard v. Sei Priv. Tr. Co.*, 2025 NCBC LEXIS 69, at *7–8 (N.C. Super. Ct. June 10, 2025) (citation omitted).

(b) **Confidential Information**. I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, developments, inventions, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(ECF No. 27.1, ¶¶ 3(a)–3(b)).

9. Further, Kadah agreed to a covenant not to compete, whereby he agreed "not to engage in Prohibited Activity within the Restricted Territory during the Restricted Period." (ECF No. 27.1, ¶ 10(c)).

10. Within that covenant not to compete, the "Restricted Period" encompasses Kadah's entire period of employment with Paladin, plus one year thereafter, while the "Restricted Territory" includes "all territories of the United States." (ECF No. 27.1, ¶ 10).

11. "Prohibited Activity" includes any

activity in which [Kadah] contribute[s] [his] knowledge, *directly or indirectly, in whole or in part*, as an employee, employer,

owner, operator, manager, advisor, consultant, contractor, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity in competition with the Company in the public safety sector, including those engaged in the business of drone designing, manufacturing and retail, drone technology (including software and hardware) development, and providing services in relation to drone as a first responder, all of which are limited to the industry of public safety. Prohibited Activity also includes activity that may require or inevitably require the use or disclosure of Confidential Information.

(ECF No. 27.1, ¶ 10(c) (emphasis added); *see also* ECF No. 27.1, ¶ 3(b) (defining "Confidential Information" to include "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties")).

12. Kadah also agreed to return to Paladin "any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items." (ECF No. 27.1, ¶ 5; ECF No. 27, ¶ 33).

13. After signing the Agreement, Kadah, by nature of his employment, "was privy to" internal information at Paladin, including six putative trade secrets: Paladin's Customer List, Prospective Client List, Partner List, Go-To-Market Strategy, Technology Strategy, and Investor List. (ECF No. 27, ¶ 39).

14. Over the next several years, Kadah routinely disagreed with Divyaditya Shrivastava, Paladin's CEO, over the management and direction of the company, at various times attempting to disrupt ongoing work and to oust Shrivastava as CEO. (ECF No. 27, ¶¶ 11–13). These issues came to a head in March 2025 when Paladin

sought investment from Canvas Ventures, a potential investor from whom Paladin had received a term sheet. (ECF No. 27, ¶¶ 14–15).

15. Although Shrivastava instructed Kadah that he "was not to be involved in investor discussions absent explicit authorization," without that authorization and in an effort to disrupt the investment, Kadah communicated with Canvas representatives around March 2025. In those communications, Kadah shared, or at least used, some or all of the six putative trade secrets at issue for the purpose of interfering with the investment. (ECF No. 27, ¶¶ 13–17, 38–48).

16. Moreover, Kadah made comments to Canvas employees "which alleged, in substance, that Paladin was being financially mismanaged and that its CEO was not competent." (ECF No. 27, ¶ 75). These communications were intended "to dissuade Canvas from investing unless [Shrivastava] stepped down." (ECF No. 27, ¶ 15). As a result of Kadah's communications, Canvas ultimately "did not invest" in Paladin. (ECF No. 27, ¶¶ 14–15).

17. Around April 2025, a similar situation occurred with another potential investor, with Paladin signing a funding term sheet with Gradient Ventures. Kadah demanded to be involved in the negotiations but was excluded. (ECF No. 27, ¶¶ 16–18, 44, 76). Thus, without authorization, Kadah contacted Gradient representatives and purportedly "used Paladin's trade secrets and other confidential business information and made misrepresentations about Paladin and its leadership" for the purpose of "interfer[ing] with the potential Gradient investment." (ECF No. 27, ¶ 17). Gradient and Paladin then failed to finalize the transaction. (ECF No. 27, ¶ 18).

18. Later, Kadah followed a similar pattern, interfering with Paladin's investment discussions with Long Journey Ventures. (ECF No. 27, ¶¶ 19–21, 44, 77). Because of Kadah's actions, Long Journey pulled its originally proposed investment before Paladin and Long Journey ultimately consummated an investment. (ECF No. 27, ¶ 21).

19. Kadah resigned from Paladin around 4 August 2025, before which he "deleted valuable information from his company-provided computer[.]" (ECF No. 27, ¶¶ 22–23).

20. In late 2025, Kadah began working for "Flock, d/b/a Flock Safety," another public safety company "focused on surveillance equipment including automated license plate readers, closed-circuit cameras, and gunfire detection software." (ECF No. 27, ¶¶ 26–27). Flock also owns Aerodome, a drone manufacturer and "primary competitor of Paladin," and Flock intends "to produce its own line of drones." (ECF No. 27, ¶¶ 25–27).

## II. ANALYSIS

21. In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court determines "whether the allegations of the [counterclaim], if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted).

22. Dismissal is appropriate if "(1) the [counterclaim] on its face reveals that no law supports the [claimant's] claim; (2) the [counterclaim] on its face reveals the

absence of facts sufficient to make a good claim; or (3) the [counterclaim] discloses some fact that necessarily defeats the [claimant's] claim." *Id.* (citation omitted).

23.    The Court treats the well-pleaded factual allegations as true and views them "in the light most favorable to the non-moving party." *E.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation omitted). Further, the Court "may properly consider documents which are the subject of" the pleading at issue and to which it specifically refers, regardless of the party that presents them. *Oberlin*, 147 N.C. App. at 60 (citation omitted). The Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the" pleading at issue. *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citations omitted).

24.    Kadah moves to dismiss each of Paladin's five causes of action, (*see generally* ECF Nos. 30 and 31), so the Court addresses each cause of action in turn.

## A. <u>Breach of Contract</u>

25.    "To state a claim for breach of contract, the complaint [or counterclaim] must allege that a valid contract existed between the parties, that [the other party] breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach." *Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison*, 281 N.C. App. 312, 332 (2022) (citation and internal quotation marks omitted); *Valle Cay Prop. Owners Ass'n, Inc. v. Slocum Mt. Real Est., LLC*, – N.C. App. –, 2026 N.C. App. LEXIS 91, at *5 (Feb. 4, 2026) ("The elements of a breach of

contract claim are (1) existence of a valid contract and (2) breach of the contract's terms." (citation omitted)).

26. Kadah concedes that the Agreement is a valid contract but asserts that Paladin has failed to plead sufficient facts to put him on notice of how he breached the Agreement. (ECF No. 31 at 6–13; ECF No. 38 at 3–6). The Court disagrees.

27. Paladin's three primary bases supporting its breach of contract cause of action are (i) an alleged breach of the non-disclosure provision, (ii) an alleged breach of a provision requiring the return of Paladin's digital property, and (iii) an alleged breach of the non-compete provision. (ECF No. 27, ¶¶ 28–36; *see* ECF No. 33 at 4–8).

28. **<u>Non-Disclosure Provision</u>**. With respect to the confidentiality and non-disclosure provision described above, (ECF No. 27.1, ¶¶ 3(a)–3(b)), Kadah contends (i) that Paladin has failed to plead specific facts to put him on notice of the alleged contractual breach and (ii) that, even if he did share information covered by the provision, that his disclosure was privileged. (ECF No. 31 at 6–8).[3]

29. "[C]laims for breach of contract are not subject to heightened pleading standards. The particularity requirement that applies to trade-secret claims does not apply" to such claims. *Evergreen Builder Sols., LLC v. Taylor,* 2025 NCBC LEXIS 174, at \*18 (N.C. Super. Ct. Dec. 29, 2025) (quoting *Fin. Carrier Servs. LLC v. Kingpin Cap. Inc.*, 2025 NCBC LEXIS 72, at \*10 (N.C. Super. Ct. June 19, 2025)).

---

[3] Kadah does not contend that the confidentiality and non-disclosure restrictions are unenforceable, making only a single passing reference, with no argument, to potential overbreadth. (ECF No. 31 at 8 ("The broad—and potentially unenforceable—provision in the Agreement covers virtually all information relating to Paladin"). The Court therefore does not address the breadth of those restrictions.

30.     Paladin has alleged that Kadah "ha[d] unauthorized communications" with three investors—Canvas Ventures, Gradient Ventures, and Long Journey Ventures—in which he "shared [putative] company trade secrets" and "other confidential business information" in violation of the Agreement, which undermined or weakened Paladin's negotiations with each potential investor. (ECF No. 27, ¶¶ 14–19).

31.     For breach of contract purposes,[4] Paladin has also identified, at least at a high level, six separate categories of putative "Trade Secrets" that it specifically contends Kadah improperly disclosed to Canvas, Gradient, and Long Journey in an effort to undermine investments in Paladin. These include (i) the Customer List containing customer contact information, purchase history, buying preferences, notes, and other insights, (ii) the Prospective Client List containing "potential customers" who are "more likely to convert into paying customers in the future," (iii) the Partner List identifying Paladin's commercial vendors and similar partners and their confidential pricing information, (iv) the Go-To-Market Strategy documents and information detailing "the methods by which Paladin identifies new markets and potential customers within that market" and how Paladin converts those leads into business relationships, (v) the Technology Strategy, "which include[s] the current state of the Paladin's product offerings, including internal discussions regarding its strengths and weaknesses," and (vi) the Investor List with "notes and thoughts on

---

[4] The possibility that a party sufficiently asserts a breach of contract claim based on disclosure of purported "Trade Secrets" does not necessarily render the information actual trade secrets, nor does it compel a determination that the party has adequately alleged a claim for misappropriation of trade secrets under the higher pleading standard for that claim.

the status of any financing discussions with those potential investors." (ECF No. 27, ¶ 39).

32. Taken as true within the context of the amended counterclaims, these allegations are sufficient to withstand a motion to dismiss the breach of contract cause of action. *See Evergreen Builder Sols.*, 2025 NCBC LEXIS 174, at *18; *see generally Wells Fargo Ins. Servs. U.S.A. v. Link*, 372 N.C. 260 (2019) (upholding the trial court's determination that breach of a confidentiality agreement was adequately pleaded). The Court therefore **DENIES** Kadah's motion to dismiss Paladin's breach of contract cause of action to the extent it is premised upon alleged breach of the confidentiality and non-disclosure obligations of the Agreement.

33. **<u>Deletion of Information on Company Computer</u>**. Similarly, Kadah asserts that Paladin has failed to sufficiently allege a breach based on Kadah's "alleged deletion of information on his company-provided computer." (ECF No. 31 at 8–9).

34. The Agreement requires Kadah to return to Paladin "any and all devices, *records*, *data*, *notes*, *reports*, proposals, lists, correspondence, *specifications*, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items." (ECF No. 27.1, ¶ 5 (emphasis added); ECF No. 27, ¶ 33).

35. Paladin asserts that Kadah deleted such information from his company-issued computer and, thus, necessarily did not return it as required. (ECF No. 27, ¶¶ 23, 33–34, 37; ECF No. 27.1, ¶ 5); *see AYM Techs., LLC v. Rodgers*, 2018 NCBC

LEXIS 14, at *52–53 (N.C. Super. Ct. Feb. 9, 2018) (explaining that a pleading "must merely 'give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief[.]'") (quoting N.C. R. Civ. P. 8(a))).

36. Taken as true, Paladin sufficiently asserts a claim for breach of contract on the basis of Kadah's alleged deletion of (and, thus, failure to return) information. The Court therefore **DENIES** Kadah's motion to dismiss Paladin's breach of contract cause of action to the extent it is premised upon alleged breach of Kadah's obligations under the Agreement to return company records, data, and other information.

37. **<u>Non-Compete Agreement</u>**. Kadah challenges both the enforceability of the Agreement's non-compete provision and the sufficiency of Paladin's pleading. (ECF No. 31 at 9–13).

38. Generally, North Carolina courts apply the parties' contractual choice-of-law provisions. *Redlee/SCS, Inc. v. Pieper*, 153 N.C. App. 421, 423 (2002) (applying Texas law pursuant to a choice-of-law clause).

39. The Agreement provides, and the parties agree, that it is governed by Texas law. (ECF No. 27.1, ¶ 12(a) ("This Agreement will be governed by the laws of the State of Texas without giving effect to any choice of law rules or principles that may result in the application of the laws of any jurisdiction other than Texas."); ECF No. 31 at 10; ECF No. 33 at 6)).

40. Under Texas law, a non-compete agreement is generally "enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement

is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a); *Cobb v. Caye Publ'g Grp., Inc.*, 322 S.W.3d 780, 783 (Tex. App. 2010).

41. Where such a covenant is "ancillary to or part of an otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee, the court *shall* reform the covenant to the extent necessary" to render it reasonable. Tex. Bus. & Com. Code § 15.51(c) (emphasis added). This reformation requirement applies, however, "only when the issue of enforceability of the covenant is finally determined and reformation is made as part of a final remedy." *Stallion Oilfield Servs. Ltd. v. Gravity Oilfield Servs., LLC*, 592 S.W.3d 205, 219 (Tex. App. 2019) (citation omitted). Thus, even when a restriction is otherwise facially unreasonable and unenforceable, a claimant may still state a claim upon which relief can be granted so long as it can be reformed (i.e., blue penciled) into a reasonable restriction. *Cf. id.*

42. In evaluating reasonableness, Texas courts have determined that "a reasonable area generally is considered to be the territory in which the employee worked while in the employment of his employer." *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App. 1992) (citations omitted); *Justin Belt Co. v. Yost*, 502 S.W.2d 681, 685 (Tex. 1973). Nationwide restrictions and those seeking to restrict

employees from working in locations where they or the employer have not previously worked are often overly broad. *Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 836 (Tex. App. 1986); *TENS Rx, Inc. v. Hanis*, 2019 Tex. App. LEXIS 10563, at *12 (Dec. 5, 2019) (explaining that an agreement may not "impose a condition upon [the employee] that would require [the employee] to know where [the employer] 'anticipates doing its business'" in the future (citing *Cobb*, 322 S.W.3d at 785)).

43.     "An industry-wide exclusion is almost always going to be unreasonable because it restrains more activity than necessary to protect the business interest of a former employer[.]" *Forum US, Inc. v. Musselwhite*, 2020 Tex. App. LEXIS 5863, at *18 (July 28, 2020) (citing *Tex. Dep't of Pub. Safety v. Caruana*, 363 S.W.3d 558, 561 (Tex. 2012)).

44.     Here, Paladin adequately alleges that these provisions are part of an otherwise enforceable agreement. Tex. Bus. & Com. Code § 15.51(c).

45.     Ultimately, Kadah's covenant not to compete contains four primary parts: (i) a one-year temporal restriction; (ii) a territorial restriction including "all territories of the United States;" (iii) a restriction on the scope of employment, preventing Kadah from participating in any activity where he contributes his knowledge, "directly or indirectly, in whole or in part," in any capacity, to any competitor of Paladin "in the public safety sector;" and (iv) a restriction preventing Kadah from working at any of ten named competitors. (ECF No. 27.1, ¶ 10(c)).

46. Kadah contends that the territorial restriction and the restricted activities go far beyond Paladin's reasonable business interests. (*See* ECF No. 31 at 11–13).

47. Here, the amended counterclaims and Agreement contain a paucity of necessary information for the Court to determine whether and to what extent the Agreement's non-compete provision is enforceable. In briefing, both Kadah and Paladin refer extensively to Kadah's former role and the scope and actual extent of his duties. (ECF No. 31 at 11–13; ECF No. 33 at 6–8; ECF No. 38 at 4–6). In contrast, neither the amended counterclaims nor the Agreement contains any allegations or explanation of Kadah's role at Paladin, the scope of his responsibilities, or the geographical areas in which he worked. (*See generally* ECF Nos. 27, 27.1). Indeed, Paladin only passingly even references Kadah's former title and role at Paladin, Vice President of Sales, in its improper "Introductory Statement." (ECF No. 27 at 1).

48. Based on their breadth (nationwide, one year, and any contribution of knowledge "directly or indirectly, in whole or in part," in any capacity, to any competitor), the restrictions are plainly unreasonable as a matter of law. *See Allan J. Richardson & Assocs., Inc.*, 718 S.W.2d at 836; *Forum US, Inc.*, 2020 Tex. App. LEXIS 5863, at *18; *TENS Rx, Inc.*, 2019 Tex. App. LEXIS 10563, at *12.

49. With no allegations concerning Kadah's job duties, the geographic scope of those duties (or Paladin's own reach), or any other facts concerning the nature of his employment, Paladin has failed to plead facts sufficient to permit a reasonable inference that the overly broad provisions of the Agreement could be reformed or blue penciled to create a reasonable and enforceable non-compete agreement.

50. Accordingly, in the exercise of judicial discretion, the Court **DISMISSES without prejudice**[5] Paladin's breach of contract cause of action predicated upon alleged breach of the non-compete provision of the Agreement.

### B. Misappropriation of Trade Secrets

51. Paladin further alleges that Kadah misappropriated purported trade secrets under both the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 *et seq.* (the "**NCTSPA**"), and the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* (the "**DTSA**").

52. To state a claim for misappropriation of trade secrets under the NCTSPA, a party generally must allege that the opposing party (i) "[k]nows or should have known of the trade secret," and (ii) "[h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." *Krawiec v. Manly*, 370 N.C. 602, 608–09 (2018) (quoting N.C. Gen. Stat. § 66-155 (internal quotation marks omitted)).

53. A trade secret is defined by statute as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

---

[5] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013). In this Order and Opinion, the Court has carefully considered whether dismissal with or without prejudice is appropriate as to each cause of action dismissed and has exercised its discretion accordingly.

b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).

54.     In deciding whether information constitutes a trade secret, courts consider

> (1) [t]he extent to which [the] information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; ([4]) the value of information to [the] business and its competitors; ([5]) the amount of effort or money expended in developing the information; and ([6]) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wells Fargo*, 372 N.C. at 278 (quoting *Wilmington Star-News, Inc. v. New Hanover Reg'l Med. Ctr., Inc.*, 125 N.C. App. 174, 180–81 (1997) (alterations in original)).

55.     The DTSA requires a substantively similar analysis, with the additional requirement "that the trade secret at issue be related to a product or service used in, or intended for use in, interstate or foreign commerce." *Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, 2024 NCBC LEXIS 99, at \*44 (N.C. Super. Ct. Jul. 12, 2024) (citations omitted); *see* 18 U.S.C. § 1836(b).

56.     Generally, a party must "identify a trade secret with sufficient particularity so as to enable [the opposing party] to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec,* 370 N.C. at 609 (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 326 (2008)).

i. Specificity of Pleading for Putative Trade Secrets

57. Paladin's amended counterclaims refer to six alleged trade secrets: (i) the Customer List; (ii) the Prospective Client List; (iii) the Partner List; (iv) the Go-To-Market Strategy; (v) the Technology Strategy; and (vi) the Investor List. (ECF No. 27, ¶¶ 39(a)–(f)). Kadah avers that these six categories are "general management strategies and standard business information," that are not sufficiently pleaded as trade secrets. (ECF No. 31 at 15).

58. As to each of the alleged trade secrets, Paladin asserts that it has expended "significant time and financial resources developing" them; that they "are not readily ascertainable through independent development and Paladin derives actual commercial value" as a result; and that Paladin has reasonably endeavored to keep the information secret via various restrictions, including password protection, limited access, and use of non-disclosure and confidentiality agreements. (ECF No. 27, ¶¶ 39–42).

59. Thus, these initial pleading requirements are met as to each category, and the Court addresses below whether Paladin has adequately pleaded each alleged trade secret with the requisite specificity.[6]

60. **Paladin's Customer List**. Paladin contends that its "Customer List" is a trade secret because it "comprises the contact information for Paladin's customers,

---

[6] Paladin adequately pleads for purposes of the DTSA that each of the putative trade secrets "relate to products and services that are used in, or intended for use in, interstate and foreign commerce," that Paladin "conducts business across state lines and internationally," and that each of the putative trade secrets "are integral to its competitive positioning and commercial operations in those markets." (ECF No. 27, ¶ 53). As a result, the Court need not further address that issue.

their purchase history, and buying preferences" and "comprises notes and other insights into these customers to drive future sales." (ECF No. 27, ¶ 39(a)).

61.  While "information regarding customer lists . . . can qualify as a trade secret under [the NCTSPA], such is the case only to the extent that the information is not 'generally known or readily ascertainable through independent development or reverse engineering.'" *Sterling Title Co. v. Martin*, 266 N.C. App. 593, 602 (2019) (quoting N.C. Gen. Stat. § 66–152(3)(a)) (internal citation omitted).

62.  For example, a customer list "contain[ing] a compilation of purchasing preferences" and other ordering habits compiled over time may constitute a trade secret. *Red Valve, Inc. v, Titan Valve, Inc.*, 2018 NCBC LEXIS 31, at *28 (N.C. Super. Ct. Apr. 10, 2018); *see S. Fastening Sys. v. Grabber Constr. Prods., Inc.*, 2015 NCBC LEXIS 42, at *11 (N.C. Super. Ct. Apr. 25, 2015).

63.  Paladin adequately alleges that the Customer List contains information including its customers' purchase history, their buying preferences, and "notes and other insights" about those customers' future sales needs that would not have been readily ascertainable through publicly available means or a cursory search of a phone book or its electronic equivalent. (ECF No. 27, ¶ 39(a)).

64.  At this early stage of the case, Paladin has sufficiently stated a claim upon which relief can be granted as to this alleged trade secret, and the Court **DENIES** Kadah's motion to the extent that it seeks dismissal of the NCTSPA and DTSA causes of action based upon the Customer List. *See Red Valve*, 2018 NCBC LEXIS 31, at *28; *S. Fastening Sys.*, 2015 NCBC LEXIS 42, at *11.

65. **<u>Paladin's Prospective Client List</u>**. Like existing customer lists, prospective customer lists can constitute trade secrets. *See Husqvarna Pro. Prods., Inc. v. Robin Autopilot Holdings, LLC*, 2023 NCBC LEXIS 155, at \*18–19 (N.C. Super. Ct. Nov. 28, 2023); *see also The Bldg. Ctr., Inc. v. Carter Lumber of the N., Inc.*, 2017 NCBC LEXIS 85, at \*19–20 (N.C. Super. Ct. Sept. 21, 2017).

66. Paladin defines its Prospective Client List as follows: "Paladin maintains a list of prospective clients it has curated from a larger set of potential leads. These are potential customers Paladin has identified as more likely to convert into paying customers in the future." (ECF No. 27, ¶ 39(b)).

67. Unlike with its Customer List, as part of which Paladin alleges that it has developed notes, insights, preferences, and other specific information, Paladin pleads no factual allegations that would permit a reasonable inference that its Prospective Client List contains any specific non-public information, constitutes confidential information, is not readily ascertainable through independent development, or otherwise might constitute a trade secret. *See Husqvarna Pro. Prods., Inc.*, 2023 NCBC LEXIS 155, at \*18–19 ("Our Supreme Court has likewise made clear that a customer-list-based-NCTSPA claim should be dismissed if the [claimant] fails to allege [facts supporting] that the customer list 'contained any information that would not be readily accessible' to the defendant." (citations omitted)).

68. Accordingly, to the extent that Paladin's NCTSPA and DTSA causes of action are predicated upon alleged disclosure or use of the Prospective Client List,

the Court **GRANTS** the motion, and those causes of action are **DISMISSED without prejudice.**

69. **Investor List**. The totality of Paladin's specific allegations regarding its Investor List are that "Paladin maintains a list of potential investors. This 'investor list' includes notes and thoughts on the status of any financing discussions with those potential investors." (ECF No. 27, ¶ 39(f)).

70. Though Paladin frames this list as an "Investor List," as alleged, it is a list of *potential* investors, akin to the Prospective Client List. (*See* ECF No. 27, ¶¶ 39(b), 39(f)). Kadah thus contends that the Investor List cannot be a trade secret because "[t]he identities of potential investors and their general appetite for funding are widely accessible in the venture ecosystem through ordinary networking channels and common databases." (ECF No. 38 at 9).

71. Beyond its conclusory allegations, Paladin pleads no facts permitting a reasonable inference that the identities of the individuals or entities on the Investor List are "not readily ascertainable through independent development." *See Husqvarna Pro. Prods., Inc.*, 2023 NCBC LEXIS 115, at *18–19.

72. Accordingly, to the extent that Paladin's NCTSPA and DTSA causes of action are based on the Investor List, the Court **GRANTS** the motion, and those causes of action are **DISMISSED without prejudice.**

73. **Paladin's Partner List**. Paladin defines its Partner List as a compilation of its "manufacturing partners, strategic partners, and vendors" and of the "preferential pricing Paladin gives [to] and receives from [these] partners based on

its long-standing relationships and other individual considerations." Paladin asserts that the relationships were "developed [through] relationships with third-party entities over the years by meeting representatives at conferences and trade shows[.]" (ECF No. 27, ¶ 39(c)).

74.     Kadah concedes that "the confidential and preferential pricing Paladin gives and receives based on long-standing relationships" may be sufficient to allege a trade secret but contends that the Pricing List is too imprecisely defined as "includ[ing]" pricing information rather than exclusively being a compilation, such that it should not be considered a trade secret. (ECF No. 31 at 7).

75.     As to its partner and third-party pricing information, Paladin has sufficiently alleged a trade secret. *See, e.g.*, *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at *13–14 (N.C. Super. Ct. May 1, 2015); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 376 (2001). Accordingly, to the extent that the NCTSPA and DTSA causes of action are predicated upon the pricing information portions of the Partner List, the Court **DENIES** the motion to dismiss.

76.     However, to the extent that Paladin seeks to treat the identities of these partners as a trade secret, Paladin has failed to sufficiently plead facts suggesting that its partners' identities are not readily ascertainable, including through the very trade shows and conferences where Paladin itself asserts that it has been "meeting representatives" for years. (ECF No. 27, ¶¶ 39(c), 41). Thus, to the extent that the NCTSPA and DTSA causes of action are premised on the identities of the partners

and third parties listed on the Partner List, the Court **GRANTS** the motion, and those causes of action are **DISMISSED without prejudice.**

77. <u>**Go-To-Market Strategy**</u>. Specific compilations of information over time, such as a long-developed investment or marketing strategy, can constitute a trade secret under certain circumstances, though it is not a trade secret if it "could be easily compiled by someone in the industry through public listings, such as trade show and attendance lists . . . or through a telephone directory." *Koch Measurement Devices*, 2015 NCBC LEXIS 45, at *13–14 (citations omitted).

78. "The focus of this requirement is generally on the amount of effort expended, including both time and money invested, in compiling the trade secret information." *Id.* (citing *Edgewater Servs., Inc. v. Epic Logistics, Inc.*, 2009 NCBC 20 (N.C. Super. Ct. Aug. 11, 2009)).

79. Here, Paladin details its Go-To-Market Strategy as a set of "written training materials" that "detail[] the methods by which Paladin identifies new markets and potential customers within that market . . . how Paladin initiates contact in that market, how it advertises, and how it intends to develop relationships in that market." Paladin also explains that the information is primarily used in presentations to train and inform new hires. (ECF No. 27, ¶ 39(d)).

80. Kadah contends that Paladin has not sufficiently pleaded that the Go-To-Market Strategy is a trade secret because the amended counterclaims do not refer to a specific implementation timeframe and lack "any detail or description of the specific presentations and exercises at issue." (ECF No. 38 at 8 (citation omitted)). Paladin is

not required, however, to provide a step-by-step guide of how exactly it uses its putative trade secret.

81. Considering the well-pleaded allegations of the amended counterclaims, the Court **DENIES** Kadah's motion to the extent that it seeks dismissal of the NCTSPA and DTSA causes of action based upon the Go-To-Market Strategy.

82. **Technology Strategy**. Paladin defines its technology strategy as (i) "the current state of the Paladin's product offerings, including internal discussions regarding its strengths and weaknesses," (ii) "future development goals and a roadmap and timeline for achieving those goals," and (iii) "a list of current inventory and equipment on hand and an identification of what products it intends to purchase or develop in the future." (ECF No. 27, ¶ 39(e)).

83. Kadah's arguments as to the Technology Strategy mirror those concerning the Go-To-Market Strategy. (ECF No. 38 at 8).

84. Again, however, considering the well-pleaded allegations of the amended counterclaims, the Court **DENIES** Kadah's motion to the extent that it seeks dismissal of the NCTSPA and DTSA causes of action based upon the Technology Strategy.

ii. Misappropriation of Putative Trade Secrets.

85. To state a claim under the NCTSPA or DTSA, a pleading must also "set forth with sufficient specificity the acts by which the alleged misappropriation occurred." *Wells Fargo,* 372 N.C. at 279 (internal citation omitted); *Velocity Sols., Inc. v. BSG, LLC*, 2015 NCBC LEXIS 54, at *23–24 (N.C. Super. Ct. May 26, 2015) ("This Court

has also recognized that the requirement of specificity extends beyond identifying trade secrets to also require specificity as to the acts by which misappropriation was accomplished." (citation omitted)).

86.    For example, allegations that "the defendant accessed the plaintiff's trade secrets through the defendant's employment with the plaintiff, the defendant became employed by a competitor of the plaintiff, and the defendant used the plaintiff's trade secrets to solicit the plaintiff's customers" are sufficiently specific, even if it requires "a 'significant inferential leap' to conclude that the defendant misappropriated the plaintiff's trade secrets." *Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at \*41 (N.C. Super. Ct. May 12, 2021) (quoting *Wells Fargo,* 372 N.C. at 281–82).

87.    In its amended counterclaims, Paladin alleges that Kadah (i) "was privy to" and "had electronic access to Paladin's Trade Secrets during his employment with Paladin," (ii) "misappropriated the Trade Secrets when he disclosed them without authorization to third parties, including Canvas, Gradient, and Long Journey, to undermine Paladin's negotiating position," and (iii) "also misappropriated the Trade Secrets when he retained them without authorization after the termination of his employment with Paladin." Paladin also alleges, albeit on information and belief, that Kadah "has misappropriated the Trade Secrets by using them in furtherance of other opportunities for himself or competing ventures." (ECF No. 27, ¶¶ 39, 43–46, 54–56).[7]

---

[7] Paladin separately, and passively, alleges that "Kadah is believed to have electronically downloaded Paladin's Trade Secrets using" his employment access. (ECF No. 27, ¶ 43). This carefully phrased language is merely an affirmative allegation that someone (presumably Paladin) subjectively believes that Kadah downloaded information, not an affirmative

88.     With its allegations, Paladin sufficiently alleges that Kadah had access to the putative trade secrets; knew and was informed of the substance of the putative trade secrets; and that he shared those alleged trade secrets with Canvas, Gradient, and Long Journey in 2025 (despite being prohibited from communicating with those parties) and otherwise improperly retained them after his employment concluded. (ECF No. 27, ¶¶ 13, 16, 39, 43–46, 54–56).

89.     Considering the allegations of the amended counterclaims, Paladin has met its burden to adequately plead misappropriation. *Wells Fargo,* 372 N.C. at 281–82; *Power Home Solar*, 2021 NCBC LEXIS 55, at \*41; *see also Bldg. Ctr.*, 2016 NCBC LEXIS 79, at \*15–16. Thus, inasmuch as Kadah seeks dismissal of the remaining portions of the NCTSPA and DTSA causes of action on this basis, the Court **DENIES** the motion.

### C. <u>Tortious Interference with Economic Opportunity or Prospective Economic Advantage</u>

90.     "[T]o state a claim for wrongful interference with prospective advantage, the [claimant] must allege facts to show that the [opposing party] acted without

---

allegation made upon information and belief that he actually did so. For example, a statement that "Paladin believes that Kadah electronically downloaded information" is an affirmative statement of Paladin's belief and is a far different allegation than a statement that, "upon information and belief, Kadah electronically downloaded information," which is an affirmative allegation of Kadah's alleged actions rather than Paladin's belief. *See Myrtle Apartments, Inc. v. Lumbermen's Mut. Cas. Co.*, 258 N.C. 49, 51 (1962) ("In stating his cause of action a plaintiff has the laboring oar. He may allege facts based on actual knowledge, or upon information and belief. . . . But when a plaintiff alleges he does not have sufficient knowledge or information to form a belief as to particulars, he disqualifies himself to allege them as facts." (citations omitted)). Regardless, however, Paladin sufficiently alleges that Kadah "was privy to" and "had electronic access to" the alleged trade secrets, such that he allegedly knew them. Whether he separately downloaded them is a different issue.

justification [i.e., with malice] in inducing a third party to refrain from entering into a contract with [it] which contract would have ensued but for the interference." *Gupton v. Son-Lan Dev. Co.*, 205 N.C. App. 133, 142–43 (2010) (quoting *Walker v. Sloan*, 137 N.C. App. 387, 393 (2000)); *CRH E., LLC v. Berastain*, 2025 NCBC LEXIS 11, at *13 (N.C. Super. Ct. 2025) ("[A] claim for tortious interference with future contracts or prospective economic advantage requires the plaintiff to allege that 'defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" (citation omitted)).

91.    When the opposing party is a corporate insider, "the element that the defendant [or counterclaim defendant] acted without justification is potentially vitiated by th[at person's] corporate position." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498 (1992). Thus, a corporate insider benefits from a presumption that his acts were in the interests of the company and were thus privileged. *Id.* (quoting *Wilson v. McClenny*, 262 N.C. 121, 133–34 (1964). "The privilege, however, is qualified, not absolute; the presumption that an officer's acts are in the corporation's interest and thus justified is overcome when the means or the officer's motives are improper." *Id.* (citation omitted); *Walker*, 137 N.C. App. at 393 (explaining that no privilege exists if the officer's actions were "not in the legitimate exercise of [his] own rights, but with design to injure the [employer], or gaining some advantage at [his employer's] expense" (citation omitted)).

92. Paladin asserts that Kadah interfered with its prospective economic opportunity or advantage with Canvas, Gradient, and Long Journey by making misrepresentations to them about Paladin and Paladin's CEO and by wrongfully disclosing its alleged trade secrets in an effort to undercut those entities' potential investments in, and relationships with, Paladin. (ECF No. 27, ¶¶ 13–21, 59–73).

93. Kadah, on the other hand, contends that he was simply "acting in his capacity as Paladin's Vice President" and that Paladin has failed to plead that his conduct was without justification or otherwise with malice. (ECF No. 31 at 17–20).

94. Based on the Court's review of the pleading, the amended counterclaims adequately state a claim upon which relief can be granted.

95. Among other things, Paladin asserts that Kadah was expressly instructed by his superior not to engage in conversations with the potential third party investors; that Kadah knowingly disobeyed this directive and went to those third parties with the specific intent of harming Paladin and undercutting Shrivastava, as CEO; and that Kadah disclosed Paladin's alleged trade secrets and other confidential information for the purpose of interfering with the parties' ongoing discussions and their anticipated contractual relationships to permit Kadah to take over Paladin. (ECF No. 27, ¶¶ 13–21, 59–73); *Walker*, 137 N.C. App. at 393 (citation omitted).

96. Though Kadah contends that Paladin has failed to plead causation, (ECF No. 31 at 19–20), the amended counterclaims assert that "Paladin obtained a term sheet from [three] potential investor[s]," that the negotiations were headed in a positive direction until Kadah had unauthorized conversations for purposes of

interfering, and that Kadah's actions led to the breakdown of any potential relationship with Canvas and Gradient and less favorable contractual terms with Long Journey. (ECF No. 27, ¶¶ 13–21, 59–73). As alleged, these facts are sufficient to draw a reasonable inference that but for Kadah's actions, Canvas or Gradient would have invested in Paladin and that Long Journey would have invested with terms more favorable to Paladin.

97. Because Paladin sufficiently pleads a claim upon which relief can be granted for tortious interference with economic opportunity or prospective economic advantage, the Court **DENIES** the motion as to that cause of action.

### D. Defamation

98. To state a claim for defamation, a claimant "must allege . . . that the [opposing party] made false, defamatory statements of or concerning the [claimant], which were published to a third person, causing injury to the [claimant's] reputation." *Taube v. Hooper*, 270 N.C. App. 604, 608 (2020) (citations omitted).

99. "Although someone cannot preface an otherwise defamatory statement with 'in my opinion' and claim immunity from liability, a pure expression of opinion is protected because it fails to assert actual fact." *Daniels v. Metro Mag. Holding Co.*, 179 N.C. App. 533, 539 (2006).

100. "Claims for defamation are subject to heightened pleading requirements." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 111, at *15 (N.C. Super. Ct. Dec. 1, 2017) (citing *Stutts v. Duke Power Co.*, 47 N.C. App. 76, 84 (1980)); *see* N.C. R. Civ. P. 9(f). Accordingly, a claimant must allege, (i) "the defamatory statement

verbatim 'or with sufficient particularity to enable the court to determine whether the statement was defamatory,'" (ii) the time at which that statement was made, and (iii) the place where the statement was made. *Addison Whitney*, 2017 NCBC LEXIS 111, at *15 (citations omitted). "In other words, the relevant pleading must allege 'who said what to whom, as well as when and where the defamatory statements were made.'" *Id.* (citations omitted).

101. "The speaking of false and defamatory words which tend to prejudice another in his trade, business, or means of livelihood, or which accuse another of committing a crime, constitute slander and are actionable per se." *Shreve v. Duke Power Co.*, 97 N.C. App. 648, 650 (1990) (citation omitted). However, a statement is not actionable per se simply because employment is mentioned or because the statement occurred in the context of employment. *See, e.g.*, *Stutts*, 47 N.C. App. at 82 (explaining that "calling plaintiff 'dishonest' or charging that plaintiff was untruthful and an unreliable employee, are not actionable per se" (citations omitted)); *Vastola v. Charlotte-Mecklenburg Lodge 9 of the FOP, Inc.*, – N.C. App. –, 2026 N.C. App. LEXIS 172, at *7–8 (2026) (unpublished) (holding that "accusing Plaintiff of 'nastiness,' opining that her actions constitute 'failures as a person with power[,]' characterizing her statements as 'dismissive' or 'snap[ping] back with insults[,]' or expressing that she made 'poor decisions' or a '[g]arbage response'" constituted unactionable opinions (citations omitted)); *Assur. Grp., LLC v. Shackleford*, 2026 NCBC LEXIS 67, at *18 (N.C. Super. Ct. Mar. 17, 2026).

102. Rather, "the allegedly defamatory statement 'alone must be construed, stripped of all insinuations, innuendo, colloquium and explanatory circumstances. The [statement] must be defamatory on its face within the four corners thereof.'" *Taube*, 270 N.C. App. at 609 (quoting *Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 318-19 (1984)).

103. Paladin alleges that, in March, April, and August 2025, Kadah made defamatory statements to Canvas, Gradient, and Long Journey in which he "alleged, in substance, that Paladin was being financially mismanaged and that its CEO was not competent." (ECF No. 27, ¶¶ 75–77).

104. As alleged, these statements lack the requisite particularity to state a claim for defamation.

105. Among other things, Paladin's allegation is a high-level paraphrase that fails to provide any indication of what Kadah actually said or to permit a reasonable inference as to what he said. Paladin's assertion as to what Kadah said "in substance" necessarily filters the alleged, unspecified statement through Paladin's own subjectivity and lacks any non-conclusory supporting facts in the amended counterclaims. *Stutts*, 47 N.C. App. at 84 ("Defamation claims must be pled 'substantially' *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory.").

106. Such conclusory, non-specific allegations "prevent[] judicial determination of whether the statements were defamatory" (or even what they were), such that the amended counterclaims lack the requisite particularity to state a claim for

defamation. *Izydore v. Tokuta*, 242 N.C. App. 434, 446–47 (2015) ("While the Court cannot say whether the alleged statements were defamatory, it can say conclusively that Plaintiff has failed to plead a claim for defamation with sufficient particularity, rendering it facially deficient. As Plaintiff failed to identify with any degree of specificity the allegedly slanderous statements, his causes of action for defamation do not state a claim and must fail."); *cf. Payne v. Thomas*, 176 N.C. 401 (1918) (addressing allegations made "in substance" and even then providing a detailed paraphrase of the statement with some direct quotation); *cf. also Vincent v. Powell*, 215 N.C. 336 (1939) (describing allegations made "in substance" with quoted language rather than plaintiff's own putative subjective interpretation of the "substance" of the communication).

107. Accordingly, the Court **GRANTS** Kadah's motion and **DISMISSES with prejudice** Paladin's defamation cause of action.

### III.    CONCLUSION

108. Therefore, in the exercise of judicial discretion where applicable, the Court hereby **GRANTS in part** and **DENIES in part** Kadah's motion to dismiss as set forth above.

    **SO ORDERED**, this 2nd day of June 2026.

/s/ Matthew T. Houston
Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases
